UNITED STATES *v.* YAZELL.

No. 10.  Argued October 13, 1965.—Decided January 17, 1966.

*Solicitor General Marshall* argued the cause for the United States.  On the brief were former *Solicitor General Cox, Assistant Attorney General Douglas, Louis F. Claiborne, Sherman L. Cohn* and *Edward Berlin.*

*J. V. Hammett* argued the cause and filed a brief for respondent.

MR. JUSTICE FORTAS delivered the opinion of the Court.

This case presents an aspect of the continuing problem of the interaction of federal and state laws in our complex federal system.  Specifically, the question presented is whether, in the circumstances of this case, the Federal Government, in its zealous pursuit of the balance due on a disaster loan made by the Small Business Administration, may obtain judgment against Ethel Mae

Yazell of Lampasas, Texas. At the time the loan was made, Texas law provided that a married woman could not bind her separate property unless she had first obtained a court decree removing her disability to contract.[1] Mrs. Yazell had not done so. At all relevant times she was a beneficiary of the peculiar institution of coverture which is now, with some exceptions, relegated to history's legal museum.

The impact of the quaint doctrine of coverture upon the federal treasury is therefore of little consequence. Even the Texas law which gave rise to the difficulty was repealed in 1963.[2] The amount in controversy in this extensive litigation, about $4,000, is important only to the Yazell family. But the implications of the controversy are by no means minor. Using *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, as its base, the Government here seeks to occupy new ground in the inevitable conflict between federal interest and state law. The Government was rebuffed by the trial and appellate courts. We hold that in the circumstances of this case, the state rule governs, and, accordingly, we affirm the decision of the United States Court of Appeals for the Fifth Circuit, 334 F. 2d 454.[3]

---

[1] Tex. Rev. Civ. Stat. Ann. Art. 4626. This section, as amended by Acts 1963, 58th Leg., p. 1188, c. 472, § 6, now gives to Texas wives the capacity to contract. Under old Art. 4626 a married woman could have her disability removed.

[2] See note 1, *supra.*

[3] The Court of Appeals by a vote of two to one affirmed the decision of the District Court in favor of the wife, based upon the Texas law of coverture. The action was instituted by the United States to recover the balance due on a note of approximately $12,000, secured by a chattel mortgage. The note was signed by both husband and wife. The mortgage had been foreclosed, the pledged assets sold, and a deficiency judgment was rendered against the husband in this same action. No appeal was taken by the husband.

Reference in some detail to the facts of this case will illuminate the problem.[4] Delbert L. Yazell operated in Lampasas, Texas, a small shop to sell children's clothing. The shop was called Yazell's Little Ages. Occasionally, his wife, Ethel Mae, assisted in the business. The business, under Texas law, was the community property of husband and wife, who, however, were barred by the coverture statute from forming a partnership. *Dillard* v. *Smith,* 146 Tex. 227, 230, 205 S. W. 2d 366, 367. A disastrous flood occurred in Lampasas on May 12, 1957. The stock of Yazell's Little Ages was ruined. Its fixtures were seriously damaged.[5]

The Small Business Administration had a regional office in Dallas, Texas. As of December 31, 1963, the agency had outstanding in Texas, generally under the supervision of its Dallas regional office, 1,363 business loans and 4,172 disaster loans, aggregating more than $60,000,000.[6] Upon the occurrence of the Lampasas flood, the SBA opened a Disaster Loan Office in Lampasas, under the direction of the Dallas office.[7]

On June 10, 1957, Mr. Yazell conferred with a representative of the SBA about a loan to enable him to cope with the disaster to his business. After a careful, detailed but commendably prompt investigation, the head of SBA's Disaster Loan Office wrote Mr. Yazell on June 20, 1957, that authorization for a loan of $12,000 had been received. Yazell was informed that the loan would be made upon his compliance with certain requirements. He was told that a named law firm in Lampasas had been

---

[4] In the discussion which follows, as specifically indicated by reference to "SBA file," we have occasionally referred to the official file of the Small Business Administration on the Yazell loan to supplement the record with facts which disclose the agency's practice.

[5] SBA file.

[6] Brief of the United States, p. 12.

[7] SBA file.

employed by the SBA to assist him in complying with the terms of the authorization.[8]

Yazell and his wife "doing business as" Yazell's Little Ages then signed a note in the amount of $12,000, payable to the order of SBA in Dallas at the rate of $120 per month including 3% interest. On the same day they also executed a chattel mortgage on their stock of merchandise and their store fixtures. By express reference to Article 4000 of the Revised Civil Statutes of Texas, the chattel mortgage exempted from its coverage retail sales made from the stock. The chattel mortgage was accompanied by a separate acknowledgment of Mrs. Yazell before a notary public, which was required by Texas law as a part of the institution of coverture. The notary attested, in the words of the applicable Texas statute, that "Ethel Mae Yazell, wife of Delbert L. Yazell . . . whose name is subscribed to the [chattel mortgage] . . . having been examined by me privily and apart from her husband . . . acknowledged such instrument to be her act and deed, and declared that she had willingly signed the same . . . ." See Tex. Rev. Civ. Stat. Ann. Art. 6608. See also Art. 1300, 4618 (Supp. 1964), 6605. These statutes all relate to conveyances of the marital homestead.

The note, chattel mortgage and accompanying documents were in due course sent to the Dallas office of SBA. Both the Lampasas law firm engaged by SBA to assist Yazell and the Acting Regional Counsel of SBA certified that "all action has been taken deemed desirable . . . to assure the validity and legal enforceability of the Note." Thereafter, the funds were made available to Yazell pursuant to the terms of the loan.[9]

From the foregoing, it is clear (1) that the loan to Yazell was individually negotiated in painfully particu-

---

[8] SBA file.
[9] SBA file.

larized detail, and (2) that it was negotiated with specific reference to Texas law including the peculiar acknowledgment set forth above. None of the prior cases decided by this Court in which the federal interest has been held to override state law resembles this case in these respects; the differences are intensely material to the resolution of the issue presented.

Next, it seems clear (1) that the SBA was aware and is chargeable with knowledge that the contract would be subject to the Texas law of coverture; (2) that both the SBA and the Yazells entered into the contract without any thought that the defense of coverture would be unavailable to Mrs. Yazell with respect to her separate property as provided by Texas law; and (3) that, in the circumstances, the United States is seeking the unconscionable advantage of recourse to assets for which it did not bargain. These points will be briefly elaborated before we reach the ultimate issue: whether, despite all of the foregoing, some "federal interest" requires us to give the United States this advantage.

It will be noted that the transaction was custom-tailored by officials of SBA located in Dallas and Lampasas, Texas, and undoubtedly familiar with Texas law. It was twice approved by Texas counsel who certified that "all action has been taken deemed desirable" even though no effort was made to cause Mrs. Yazell to have her incapacity removed under Texas law.[10] In at least two decisions since 1949, federal courts had applied the Texas law of coverture in actions under federal statutes.[11] At no time does it appear that the SBA made the slightest suggestion to the Yazells or their

[10] See note 1, *supra*.

[11] *United States* v. *Belt*, 88 F. Supp. 510 (D. C. S. D. Tex.) (suit held barred by coverture); *Texas Water Supply Corp.* v. *Reconstruction Finance Corp.*, 204 F. 2d 190 (C. A. 5th Cir.) (case held within an exception to coverture).

SBA-appointed counsel that it intended to enforce the contract against Mrs. Yazell's separate property.[12] The forms used, although specifically adapted to this transaction and to Texas law, made no reference to such an intent, and it is either probable or certain that no such intent existed. As stated above, the SBA now has more than 5,000 loans outstanding in Texas.[13] The Solicitor General informed the Court that the SBA, in conformity with the general practice of government lending agencies, requires that the signature of the wife be obtained as a routine matter.[14] If it had been intended that the result now sought by the Government would obtain, simple fairness as well as elementary craftsmanship would have dictated that in a Texas agreement the wife be advised, at least by formal notation, that she was, in the opinion of SBA, binding her separate property, despite Texas law to the contrary. Again, it must be empha-

---

[12] SBA file.

[13] The Ninth Circuit, in *Bumb* v. *United States,* 276 F. 2d 729 (C. A. 9th Cir.), aptly observed in response to a claim by the Small Business Administration that the "need for uniformity" excused it from complying with a California "bulk sales" statute requiring notice of intent to mortgage:

"It is true that the Small Business Administration operates throughout the United States, but such fact raises no presumption of the desirability of a uniform federal rule with respect to the validity of chattel mortgages in pursuance of the lending program of the Small Business Administration. The largeness of the business of the Small Business Administration offers no excuse for failure to comply with reasonable requirements of local law, which are designed to protect local creditors against undisclosed action by their local debtors which impair the value of their claims. It must be assumed that the Small Business Administration maintains competent personnel familiar with the laws of the various states in which it conducts business, and who are advised of the steps required by local law in order to acquire a valid security interest within the various states." *Id.,* at 738.

[14] Brief for the United States, p. 11.

sized that this was a custom-made, hand-tailored, specifically negotiated transaction. It was not a nationwide act of the Federal Government, emanating in a single form from a single source.[15]

We now come to the basic issue which this case presents to this Court. Is there a "federal interest" in collecting the deficiency from Mrs. Yazell's separate property which warrants overriding the Texas law of coverture? Undeniably there is always a federal interest to collect moneys which the Government lends. In this case, the federal interest is to put the Federal Government in position to levy execution against Mrs. Yazell's separate property, if she has any, for the unpaid balance of the $12,000 disaster loan after the stock of merchandise and fixtures of the store have been sold, after any other community property has been sold, and after Mr. Yazell's leviable assets have been exhausted. The desire of the Federal Government to collect on its loans is understandable. Perhaps even in the case of a disaster loan, the zeal of its representatives may be commended. But this serves merely to present the question—not to answer it. Every creditor has the same interest in this respect; every creditor wants to collect.[16] The United States, as sovereign, has certain preferences and priorities,[17] but neither Congress nor this Court has

---

[15] Contrast *Clearfield Trust Co.* v. *United States,* 318 U. S. 363. Compare also *United States* v. *Helz,* 314 F. 2d 301 (C. A. 6th Cir.), arising under the National Housing Act, 48 Stat. 1246, 12 U. S. C. § 1702 *et seq.,* which issues separate forms for each State but does not negotiate with individual applicants. See *United States* v. *View Crest Garden Apts., Inc.,* 268 F. 2d 380 (C. A. 9th Cir.), cert. denied, 361 U. S. 884.

[16] In this case, the Yazells' general creditors collected about 20% of their claims.

[17] For example, Congress has provided for preference in the case of debts owed the United States on tax delinquencies. See 26 U. S. C. §§ 6321, 6323 (1964 ed.); 11 U. S. C. § 104 (a) (4) (1964 ed.). 31

ever asserted that they are absolute. For example, no contention will or can be made that the United States may by judicial fiat collect its loan with total disregard of state laws such as homestead exemptions.[18] Accordingly, generalities as to the paramountcy of the federal interest do not lead inevitably to the result the Government seeks. Our problem remains: whether in connection with an individualized, negotiated contract, the Federal Government may obtain a preferred right which is not provided by statute or specific agency regulation, which was not a part of its bargain, and which requires overriding a state law dealing with the intensely local interests of family property and the protection (whether or not it is up-to-date or even welcome) of married women.

The Government asserts that this overriding federal interest can be found in the unlimited right of the Federal Government to choose the persons with whom it will contract, citing *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, which is remote from the issue at hand.[19] Realisti-

---

U. S. C. § 191 (1964 ed.) also provides a priority for the United States in some situations involving ordinary debts. See Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L. J. 905 (1954).

[18] See pp. 354–356, *infra*.

[19] The Government relies upon *Perkins*, at p. 127, for the proposition that the United States has "the unrestricted power . . . to determine those with whom it will deal." Brief for the United States, p. 9. *Perkins* had nothing to do with the question of the power of the United States to override state law declaring the incapacity of persons to contract. The Court there held that private companies alleging their right as potential bidders for government contracts lacked standing to challenge a federal statute requiring federal procurement contracts to include a minimum wage stipulation. The Government quotes the decision out of context, omitting the following italicized words: the Court stated that *"Like private individuals and businesses,* the Government enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and

cally, in terms of Yazell's case, this has nothing to do with our problem: The loan was made to enable Yazell to reopen the store after the disaster of the flood. The SBA chose its contractors with knowledge of the limited office of Mrs. Yazell's signature under Texas law. That knowledge did not deter them. If they had "chosen" Mrs. Yazell as their contractor in the sense that her separate property would be liable for the loan, presumably they would have said so, and they would have proceeded with the formalities necessary under Texas law to have her disability removed.[20] In all reality, the assertion that this case involves the right of the United States to choose its beneficiaries cannot determine the issue before us.[21] This case is not a call to strike the shackles of an obsolete law from the hands of a beneficent Federal Government, nor is it a summons to do battle to vindicate the rights of women. It is much more mundane and commercial than either of these. The issue is whether the Federal Government may voluntarily and deliberately make a negotiated contract with knowledge of the limited capacity and liability of the persons with whom it contracts, and thereafter insist, in disregard of such limitation, upon collecting (a) despite state law to the contrary relating to family property rights and liabilities, and (b) in the absence of federal statute, regulation

---

conditions upon which it will make needed purchases." Mrs. Yazell would subscribe to *that* proposition—indeed, the brunt of her case is that the Government, in entering ordinary commercial contracts, should be treated "like private individuals and businesses."

[20] See note 1, *supra.*

[21] It is worth noting that in the only situation where the United States' power to choose its contractors might arise—where a married woman has separate property in respect of which she seeks or the Government offers a loan—the Texas law expressly provided for her power to contract and to bind her separate property. Tex. Rev. Civ. Stat. Ann. Art. 4614.

or even any contract provision indicating that the state law would be ·disregarded.

The institution of coverture is peculiar and obsolete. It was repealed in Texas after the events of this case. It exists, in modified form, in Michigan.[22] But the Government's brief tells us that there are 10 other States which limit in some degree the capacity of married women to contract.[23] In some of these States, such as California, the limitations upon the wife's capacity and responsibility are part of an ingenious, complex, and highly purposeful distribution of property rights between husband and wife, geared to the institution of community property and designed to strike a balance between efficient management of joint property and protection of the separate property of each spouse.[24] It is an appropriate inference from the Government's brief that its position is that the Federal Government, in order to collect on a negotiated debt, may override all such state arrangements despite the absence of congressional enactment or agency regulation or even any stipulation in the negotiated

---

[22] Mich. Stat. Ann. §§ 26.161, 26.181, 26.182, 26.183. See *Koengeter* v. *Holzbaugh,* 332 Mich. 280, 50 N. W. 2d 778; Weingarten, Creditors' Rights, 10 Wayne L. Rev. 184 (1963).

[23] Brief for the United States, p. 15, n. 10. The States are, in addition to Texas and Michigan: Alabama, Arizona, California, Florida, Georgia, Idaho, Indiana, Kentucky, Nevada, and North Carolina. With the exception of Michigan, see n. 22, *supra,* none of these States other than Texas has a coverture rule applicable to facts such as those presented by this case.

[24] In California a wife has full capacity to contract. Cal. Civ. Code § 158. Her separate property is liable for her own debts, as are her earnings. Cal. Civ. Code §§ 167, 171. However, in connection with California's community property law governing the management and control of community property, see Cal. Civ. Code (Supp. 1964) §§ 172, 172a, the community property is generally not subject to the debts of the wife. Cal. Civ. Code § 167. See also Ariz. Rev. Stat. Ann. § 25–214; Nev. Rev. Stat. § 123.230.

contract or any warning to the persons with whom it contracts.[25]

We do not here consider the question of the constitutional power of the Congress to override state law in these circumstances by direct legislation [26] or by appropriate authorization to an administrative agency coupled with suitable implementing action by the agency.[27] We decide only that this Court, in the absence of specific congressional action, should not decree in this situation that implementation of federal interests requires overriding the particular state rule involved here. Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements. They should be overridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied.

Each State has its complex of family and family-property arrangements. There is presented in this case no reason for breaching them. We have no federal law

---

[25] The Government's argument, if accepted by this Court, would cast doubt, in addition, on state laws preventing wives from conveying realty without the consent of their husbands—see, e. g., Ala. Code Tit. 34, § 73; Fla. Stat. Ann. (Supp. 1964) § 708.08; Ind. Ann. Stat. § 38–102; Ky. Rev. Stat. § 404.020 (executory sales contract); N. C. Gen. Stat. § 52–2—or from acting as guarantors or sureties—see, e. g., Ga. Code Ann. § 53–503; Ky. Rev. Stat. § 404.010.

[26] See, e. g., United States v. Bess, 357 U. S. 51, which held that the exemptions from execution to satisfy federal tax liens provided in § 3691 of the Internal Revenue Code of 1939 (now 26 U. S. C. § 6334) are exclusive of state exemptions.

[27] See, e. g., United States v. Shimer, 367 U. S. 374 (Pennsylvania rule precluding mortgagee who buys mortgaged property at foreclosure from seeking deficiency judgment held inconsistent with scheme of Veterans Administration regulations under which mortgage issued).

relating to the protection of the separate property of married women. We should not here invent one and impose it upon the States, despite our personal distaste for coverture provisions such as those involved in this case. Nor should we establish a principle which might cast doubt upon the effectiveness in relevant types of federal suits of the laws of 11 other States relating to the contractual positions of married women, which, as the Government's brief warns us, would be affected by our decision in the present case. Clearly, in the case of these SBA loans there is no "federal interest" which justifies invading the peculiarly local jurisdiction of these States, in disregard of their laws, and of the subtleties reflected by the differences in the laws of the various States which generally reflect important and carefully evolved state arrangements designed to serve multiple purposes.

The decisions of this Court do not compel or embrace the result sought by the Government. None of the cases in which this Court has devised and applied a federal principle of law superseding state law involved an issue arising from an individually negotiated contract. None of these cases permitted federal imposition and enforcement of liability on a person who, according to state law, was not competent to contract. None of these cases overrode state law in the peculiarly state province of family or family-property arrangements.[28]

---

[28] On the contrary, in *De Sylva* v. *Ballentine*, 351 U. S. 570, the Court applied state law to define "children" although the issue arose in connection with the right to renew a copyright—a peculiarly federal area. Cf. *Reconstruction Finance Corp.* v. *Beaver County*, 328 U. S. 204; *Commissioner* v. *Stern*, 357 U. S. 39. We do not regard *Wissner* v. *Wissner*, 338 U. S. 655, as an exception. There California sought to apply its community property rule that a wife has a half interest in her husband's life insurance if the premiums come out of community property (his earnings), in derogation of the federal statutory policy that soldiers have an absolute right to name the beneficiary of their National Service Life Insurance. The Court held

This Court's decisions applying "federal law" to supersede state law typically relate to programs and actions which by their nature are and must be uniform in character throughout the Nation. The leading case, *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, involved the remedial rights of the United States with respect to federal commercial paper. *United States* v. *Allegheny County,* 322 U. S. 174, was treated by the Court as involving the liability of property of the United States to local taxes.[29] *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447, involved the rights of the FDIC as an insurer-assignee of a bank as against the maker of a note given the bank on the secret understanding it would not be called for payment. The bank deposit insurance program is general and standardized. In all relevant aspects, the terms are explicitly dictated by federal law.[30] The Court held that FDIC was entitled to a federal rule protecting it against misrepresentations as to the financial condition of the banks it insures, accomplished by secret arrangements inconsistent with the policy of the applicable federal statutes.

On the other hand, in the type of case most closely resembling the present problem, state law has invariably

---

that the California rule would directly have undercut congressional intent with respect to the Federal Government's generalized, nationwide insurance program.

[29] The Court held that a state tax rule under which movable machinery was part of the realty of a manufacturer for purposes of an ad valorem property tax could not be applied so as to subject a manufacturer renting the machinery from the United States to such an enhancement of the value of its realty. The Court held that the title to the machinery was in the United States, and was effective to protect the machinery from local taxes. But compare *Reconstruction Finance Corp.* v. *Beaver County,* 328 U. S. 204.

[30] The statute involved in *D'Oench, Duhme* is now the Federal Deposit Insurance Act, 64 Stat. 873, 12 U. S. C. § 1811 *et seq.* (1964 ed.).

been observed. The leading case is *Fink* v. *O'Neil*, 106 U. S. 272. There the United States sought to levy execution against property defined by state law as homestead and exempted by the State from execution. This Court held that Revised Statutes § 916, now Rule 69 of the Federal Rules of Civil Procedure, governed, and that the United States' remedies on judgments were limited to those generally provided by state law.[31] These homestead exemptions vary widely. They result in a diversity of rules in the various States and in a limitation upon the power of the Federal Government to collect which is comparable to the coverture limitation.[32] The

---

[31] See also *Custer* v. *McCutcheon*, 283 U. S. 514. Rule 69 provides that procedure on execution shall be "in accordance with the practice and procedure of the state in which the district court is held . . . except that any statute of the United States governs to the extent that it is applicable." With the one exception of federal tax cases, see n. 26, *supra*, state execution procedure seems to be applied without question, even in suits by the United States. See, *e. g., United States* v. *Harpootlian*, 24 F. 2d 646 (C. A. 2d Cir.) (applying state law on the time within which examination can be had of a judgment debtor after an execution against him is returned unsatisfied, over an objection by the Government that this was an improper application of a statute of limitations to the sovereign); *United States* v. *Miller*, 229 F. 2d 839 (C. A. 3d Cir.) (Pennsylvania prohibition of garnishment of future debts of garnishee to debtor).

[32] In Texas, the value of the homestead that is exempt from execution is $5,000, as of the time of its designation as a homestead and without reference to the value of any improvements, Tex. Rev. Civ. Stat. Ann. Art. 3833; Tex. Const. Art. 16, §§ 50, 51. In Tennessee and Maine, the homestead exemption is $1,000, Tenn. Const. Art. 11, § 11; Me. Rev. Stat. Ann. Tit. 14, §§ 4551, 4552; in California, it is $15,000 for the head of a family, $7,500 for all others, Cal. Civ. Code §§ 1240, 1260 (Supp. 1964); cf. Cal. Const. Art. 17, § 1. If Mrs. Yazell's separate property were a homestead under Texas law, she might have been able to defeat execution on the judgment that might have been entered against her in this suit to a far greater degree than some other debtor to the SBA could who happened to

purpose and theory of the two types of limitations are obviously related.[33] Another illustration of acceptance of divergent and limiting state laws is afforded by *Reconstruction Finance Corp.* v. *Beaver County*, 328 U. S. 204. In that case this Court held that the state classification of property owned by the Reconstruction Finance Corporation as "real property" for tax purposes would prevail in determining whether the property was within the class of property as to which Congress had waived the federal exemption from local taxation.

Generally, in the cases applying state law to limit or condition the enforcement of a federal right, the Court has insisted that the state law is being "adopted" as the federal rule. Even so, it has carefully pointed out that this theory would make it possible to "adopt," as the

reside in Tennessee or Maine; and a Californian would do even better than Mrs. Yazell.

Other exemptions from execution vary similarly. For example, Texas, Maine and California provide for detailed personal exemptions. In Texas, a family is exempt not only as to its homestead, but also its furniture, cemetery lot, implements of husbandry, tools and books of a trade, family library and pictures, five cows and their calves, two mules, two horses, one wagon, one carriage, one gun, 20 hogs, 20 sheep, harness, provisions and forage for home consumption, current wages, clothing, 20 goats, 50 chickens, 30 turkeys, 30 ducks, 30 geese, 30 guineas, and one dog. A somewhat less extensive list is provided for persons who are not constituents of a family. Tex. Rev. Civ. Stat. Ann. Art. 3832, 3835. Cf. also Me. Rev. Stat. Ann. Tit. 14, § 4401; Cal. Civ. Proc. Code §§ 690–690.52 (1955 ed. and Supp. 1964). Texas also has other special protections, including a provision applicable to ferrymen, saving to them their ferryboat and tackle, Tex. Rev. Civ. Stat. Ann. Art. 3836.

[33] Rule 64, adopting state provisional remedies for security in advance of judgment, can lead to the same kind of diversity as does Rule 69. Cf. *De Beers Consolidated Mines, Ltd.* v. *United States*, 325 U. S. 212. State provisional remedies vary greatly. See 7 Moore's Fed. Prac. ¶ 64.04 [3].

operative "federal" law, differing laws in the different States, depending upon the State where the relevant transaction takes place.[34]

Although it is unnecessary to decide in the present case whether the Texas law of coverture should apply *ex proprio vigore*—on the theory that the contract here was made pursuant and subject to this provision of state law—or by "adoption" as a federal principle, it is clear that the state rule should govern. There is here no need for uniformity. There is no problem in complying with state law; in fact, SBA transactions in each State are specifically and in great detail adapted to state law.[35]

---

[34] "In our choice of the applicable federal rule we have occasionally selected state law." *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 367. The Court observed in *Clearfield* that the difficulty of determining which state rule to apply could be a persuasive argument in favor of a federal rule. *Ibid.* No such difficulty exists here, of course.

In *Royal Indemnity Co.* v. *United States,* 313 U. S. 289, cited by the Government for the proposition that "the rights of the United States under contracts entered into as part of an authorized nationwide program are to be determined by federal and not by State law," Brief for the United States, p. 7, the Court, while insisting that "the rule governing the interest to be recovered as damages for delayed payment of a contractual obligation to the United States is not controlled by state statute or local common law," 313 U. S., at 296, nonetheless held that the statutory rate prevailing in the State where the obligation was undertaken and to be performed was a suitable one for adoption by the federal courts. Cf. also *Board of Commissioners* v. *United States,* 308 U. S. 343.

[35] The Financial Assistance Manual of the Small Business Administration, SBA–500, is replete with admonitions to follow state law carefully. Thus § 401.03 reads:

*"Compliance with Applicable Laws.* When the United States disburses its funds, it is exercising a constitutional function or power and its rights and duties are governed by Federal rather than local law. However, it is frequently necessary, in the obtaining of a marketable title or enforceable security interest in property, to follow

There is in this case no defensible reason to override state law unless, despite the contrary indications in *Fink* v. *O'Neil* and elsewhere as has been set forth, we are to take the position that the Federal Government is entitled to collect regardless of the limits of its contract and regardless of any state laws, however local and peculiarly domestic they may be.

The decision below is

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

I join the Court's opinion with a single qualification, namely, that I place no reliance on any of the particularities of the negotiations between the parties respecting this loan. In my view the conclusion that Texas law governs the issue before us is amply justified by the Court's appraisal of the competing state and federal interests at stake, irrespective of whether the parties negotiated with specific reference to Texas law.

---

local procedural requirements and statutes. Accordingly, care should be used in following or meeting all applicable requirements and statutes of the State in which the property is located, including the filing and refiling, recording and re-recording of any documents."

See also, *e. g.*, §§ 401.06, 402.04, 403.03, 404.01, 404.02, 406.02, 407.03, 407.04 ("State laws vary as to the dominion a lender must exercise over assigned accounts receivable. . . . In drafting servicing provisions . . . counsel should carefully consider the applicable laws of the State . . . ."), 408.01, 410.08 ("In order to guard against this Agency's liability for payment of insurance premiums under the standard mortgagee clause in any state the law of which . . . makes the mortgagee so liable, the regional director shall . . . ."), 706.01. Section 1008.03 authorizes a Regional Director of SBA, "In instances where a disaster area is distantly located from the Regional office and where speed and economy of administration make such procedure advisable," to recommend to the General Counsel that "local counsel be appointed and that he be authorized to rely on such counsel for all legal matters and closing opinions." See, in addition, 13 CFR (1965 Supp.) § 122.17.

Mr. Justice Black, with whom Mr. Justice Douglas and Mr. Justice White join, dissenting.

Because I think the dissenting opinion of Judge Prettyman in the Court of Appeals gives a more accurate picture of the relevant facts and issues in this case than does the opinion of the Court, and because I agree with the legal conclusion Judge Prettyman reached for the reasons he gave, I set out his dissent below and adopt it as my own.

"Mrs. Yazell and her husband, trading as a partnership, borrowed money from the Federal Government through the Small Business Administration. They signed a note for the loan. They also signed, as security for the loan, a chattel mortgage on the merchandise in their store. They could not pay, and the Government foreclosed on the security. A deficiency remained. The Government sued on the note, praying judgment for the balance of the loan. Mrs. Yazell moved for summary judgment on the ground that she is a married woman and so, in Texas, no personal judgment and no judgment affecting her separate estate can be rendered against her, with a few exceptions not here material. The District Court judge agreed with her, and so do my brethren on this court. I am contrari-minded.

"A loan from the Federal Government is a federal matter and should be governed by federal law. There being no federal statute on the subject, the courts must fashion a rule. This is the clear holding of Clearfield Trust Co. v. United States.[1]

"To effectuate the policy of the Small Business Act, loans of many hundreds of thousands of dollars each year to businesses must be made throughout the country. These loans can be made only under

"[1] 318 U.S. 363 . . . (1943)."

conditions which will reasonably assure repayment.[2] I think the Act should be of uniform application throughout the country. If local rules are to govern federal contracts in respect to the capacity of married women to contract, so too should local rules as to all other features of contractual capacity govern such contracts. Chaos which would nullify federal programs for disaster relief would arise. And of course there is no reason to restrict this decision to loans under the Small Business Act. It would necessarily apply with equal force to every other federal program which involves contracts between the Federal Government and individuals. A multitude of programs will be frustrated by it.

"It seems to me that, if a person has capacity to get money from the Federal Government, he has the capacity to give it back. The present lawsuit does not involve a general liability for debt; it involves merely the obligation to repay to the Government specific money borrowed from the Government. It seems to me that if a person borrows a horse from a neighbor he ought to be required to give it back if the owner wants it back, whether or not the borrower is a married woman. I suppose the Texas law, by nullifying repayments by married women, tends to minimize ill-advised borrowing. But I think the federal rule ought to be that you must repay what you borrow.

"It seems to me that United States v. Helz [3] was correctly decided by the Sixth Circuit and that it applies here. I would follow it." 334 F. 2d 454, 456.

---

"[2] 15 U.S.C. § 636 (a) (7); 13 C.F.R. § 120.4–2(c) (1958)."
"[3] 314 F.2d 301 (1963)."

Though I think that Judge Prettyman's dissent is enough to justify his rejection of the Texas law of "coverture" as a part of federal law, I consider it appropriate to add another reason, which in itself would be enough for me. The Texas law of "coverture," which was adopted by its judges and which the State's legislature has now largely abandoned, rests on the old common-law fiction that the husband and wife are one. This rule has worked out in reality to mean that though the husband and wife are one, the one is the husband. This fiction rested on what I had supposed is today a completely discredited notion that a married woman, being a female, is without capacity to make her own contracts and do her own business. I say "discredited" reflecting on the vast number of women in the United States engaging in the professions of law, medicine, teaching, and so forth, as well as those engaged in plain old business ventures as Mrs. Yazell was. It seems at least unique to me that this Court in 1966 should exalt this archaic remnant of a primitive caste system to an honored place among the laws of the United States.