UNITED STATES of America, Plaintiff,

v.

Floyd S. NIXON, Jr., et al., Defendants.

Civ. A. No. 4–72130.

United States District Court,
E. D. Michigan, S. D.

June 18, 1975.

Samuel J. Behringer, Jr., Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Patrick J. Keating, Detroit, Mich., for defendants Nixons.

## OPINION

RALPH M. FREEMAN, District Judge.

This matter is before the court on the motion of the defendants Floyd S. Nixon, Jr., and Marjorie J. Nixon to exempt the separate estate of Marjorie J. Nixon from liability in plaintiff's summary judgment. The plaintiff, United States, has previously brought a motion for summary judgment against the Nixons as guarantors on a promissory note. The Nixons have no objection to the granting of this motion but contend that the judgment should provide that it may only be satisfied out of the separate estate of Floyd S. Nixon or out of the property held jointly by Floyd and Marjorie Nixon. They contend that under Michigan law the separate estate of Marjorie Nixon is not liable for this joint obligation.

On June 14, 1973, the Fidelity Bank of Michigan executed a $385,000 loan to The Haycon Corporation. The Haycon Corporation executed a promissory note in this amount. Defendants Robert M. Bonus, Ruth W. Bonus, Floyd S. Nixon and Marjorie J. Nixon were guarantors of this loan. On January 11, 1974, The Haycon Corporation defaulted on its payments. The promissory note and guarantees were then assigned by the bank to the Small Business Administration (SBA), an agency of the United States, pursuant to an SBA guaranty agreement. The United States now

seeks to recover the amount owing on the promissory note from the guarantors. A consent judgment has already been entered against the Bonuses. As indicated above, the only question presented is whether a judgment against the Nixons may be satisfied out of the separate estate of Marjorie Nixon.

■ The government apparently agrees that under Michigan law the sole and separate estate of a married woman is not liable for obligations incurred jointly by the husband and wife unless separate consideration has run to the wife's estate. See M.S.A. §§ 26.181–26.-184 (M.C.L.A. §§ 557.51–557.54) [The Married Women's Property Act] and *City Finance Co. v. Kloostra*, 47 Mich. App. 276, 209 N.W.2d 498 (1973). However, the government contends that under a 6th Circuit case and a 1966 SBA regulation, this law is not applicable to the case at bar since this is a contract action involving the federal government. It also points out that it would be incorrect to characterize the loan transaction as one occurring entirely under the laws of Michigan because the executed guaranty document is entitled "Small Business Administration Guaranty" and bears the designation "SBA Loan No. GP 549313 10 00 DET." At the hearing on this motion the government also provided the court with a copy of a Personal Financial Statement which was signed by Mrs. Nixon and was submitted to the SBA for the purpose of inducing the SBA to grant the loan to The Haycon Corporation. Thus, argues the government, Marjorie Nixon cannot allege that she was without knowledge of the participation of the SBA.

A ruling on the issue before the court involves the consideration of (1) Sixth Circuit law; (2) the Supreme Court case of *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966); and (3) an SBA regulation found at 13 CFR 101.1(d)(1)–(4). For purposes of clarity, these will be discussed separately before an attempt is made to determine the proper conclusion to be drawn.

SIXTH CIRCUIT LAW

Three Sixth Circuit cases bear discussion: *Fetter v. United States*, 269 F.2d 467 (6th Cir. 1959); *United States v. Helz*, 314 F.2d 301 (6th Cir. 1963); and *Harris v. Manufacturers National Bank of Detroit*, 457 F.2d 631 (6th Cir. 1972) cert. denied 409 U.S. 885, 93 S.Ct. 118, 34 L.Ed.2d 142. The government relies on the *Helz* case while the defendants contend that the *Fetter* and *Harris* cases indicate present Sixth Circuit thinking on this subject.

The first of the three cases decided was *Fetter v. United States, supra.* In this case the United States was the owner, by assignment, of notes executed by Albert and Mary Louise Fetter as husband and wife. The notes were Title I, Federal Housing Administration notes. Prior to the filing of suit on the notes, Albert Fetter was discharged in bankruptcy. He pled this discharge as a defense and the wife contended that her separate property was not liable because of the Married Women's Property Act. The district court had granted judgment to the United States, which judgment could only be satisfied out of property owned by the Fetters as tenants by the entireties. The Fetters appealed.

The issue before the court was whether Albert Fetter's discharge in bankruptcy precluded an adjudication of liability against him. Under Michigan law, the discharge did not preclude the subsequent rendition of a joint judgment against husband and wife which could be satisfied out of property held by them as tenants by the entireties. The Sixth Circuit held that it would have been bound by this Michigan law if jurisdiction were founded on diversity, but that it was not so bound because jurisdiction existed by virtue of the fact that the United States was the plaintiff (28 U.S.C. § 1345). It concluded that, by the terms of the Bankruptcy Act, Albert Fetter's several and joint obligations had been discharged and that no

judgment could be entered against him or his wife. The following statements demonstrate the court's reasoning which led to this result:

> The obligations sued on in this action are each a joint and several promise to pay on the part of the husband and wife. *Under disability of coverture, the wife may validly create a joint liability with her husband that will subject their joint property to creditors' remedies for such joint obligations.* Section 26.181–26.184, Michigan Statutes Annotated, supra. *It is, therefore, apparent that the husband had a joint and several liability on the notes, but that the wife was capable only of having incurred a joint liability.* If the husband's joint and several liability has been discharged by his proceeding in bankruptcy, that discharge prevents judgment not only against the husband but against the wife. Such is the reasoning in the case of Phillips v. Krakower, 4 Cir., 46 F.2d 764, 765, where it is said, "(A)lthough the bankruptcy proceeding has brought no interest in the estate by entireties into court for the benefit of the creditors of Phillips, his discharge in bankruptcy will remove that entire property beyond the reach of creditors entitled to subject it to their claims." See also Lockwood v. Exchange Bank, 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061, referred to in the Phillips case, holding that in federal court the bankruptcy statute controls, although admittedly an entirely different result would be reached under state law.

(269 F.2d at 471) (Emphasis added)

Thus, although the court recognized that it was not bound by Michigan law, it nevertheless referred to Michigan law in explaining why no judgment against the wife was permissible. The defendants rely on this language as indicating that the Sixth Circuit applied the Michigan Married Women's Property Act as *federal* law. However, it is not at all clear that the issue of the wife's separate liability was before the court or

that the court intended to adopt Michigan law as the defendants suggest.

Some light is shed on this question by reference to the court's decision, four years later, in *United States v. Helz, supra.* In *Helz,* Mary Helz and her husband executed two notes to a bank to secure a loan. Prior to the making of the loan, the Helz's had executed credit applications on Federal Housing Administration forms which stated that "this application is submitted to obtain credit under the terms of Title I of the National Housing Act." The notes were defaulted and assigned to the United States (FHA).

Prior to suit being brought against Mary Helz on the note, her husband was discharged in bankruptcy. Relying on the *Fetter* case, the defendant moved to dismiss the case and the district court so ordered. The Sixth Circuit reversed. With regard to the *Fetter* case, the following statements are pertinent:

> The Government concedes that under Michigan law, *which was involved in the Fetter case,* no judgment on the notes could be entered against appellee, a married woman. The Fetter case settles this case should it be that Michigan law applies, but the Government presents in this case a *question that was not raised or decided in the Fetter case.*

> The basic contention of the Government is that the relief sought should be governed by federal law and that the federal law should be determined by the Court, under the circumstances here presented, as requiring a judgment to be entered against appellee.

(314 F.2d at 302) (Emphasis added)

The Court agreed. As this was not a diversity case, the court was not bound by state law. Absent an applicable federal statute, the court could fashion a rule. In so doing, the court could adopt the state law or fashion the governing rule by its own standards. "In cases affecting government money and the credit of the government, the authorities set up the principle that federal law should

apply." (314 F.2d at 303) The court thus concluded that Michigan law did not apply "and that in fashioning such federal law we rule that the old common law defense of coverture to an action on a note executed by a married woman under the National Housing Act, is not a valid defense." (314 F.2d at 303).

Thus, in *Helz*, the 6th Circuit specifically rejected the proposition that the Michigan law at issue here be applied as federal law in a suit such as the one at bar. However, the defendants contend that *Helz* deviated from the principles applied in *Fetter* and further argue that the court returned to these principles in the 1972 case of *Harris v. Manufacturers National Bank, supra.*

In the *Harris* case, the plaintiff (Harris) sought an injunction against the defendant's execution of a state court judgment on a note signed by Harris and his wife. This joint judgment against the Harrises was obtained subsequent to the husband's discharge in bankruptcy. The district court granted the defendant's motion for summary judgment, finding that Michigan law controlled and that it did not bar a joint judgment after the husband's discharge. The Sixth Circuit reversed, finding that Michigan law did not apply. In so doing, the court cited *Fetter* as controlling.

It is not necessary to further discuss the *Harris* case. The question of the liability of the wife's separate estate was not before the court and no discussion of this issue is contained in the opinion. It is true that *Harris* reaffirmed the *Fetter* case, but neither of these cases is applicable to the case at bar. The court believes that *Helz* was not a departure from *Fetter* and that any conflict between the *Fetter* dicta and the *Helz* decision must be resolved in favor of the *Helz* decision which was the only one of the three cases to squarely face and decide the issue which is before the court in the case at bar.

## YAZELL CASE

In *United States v. Yazell*, 334 F.2d 454 (5th Cir. 1964), the Fifth Circuit recognized a defense similar to that which had been rejected by the Sixth Circuit in the *Helz* case. In *Yazell*, a husband and wife received a disaster loan from the SBA and executed a promissory note therefor. The contract was made in Texas and Texas law provided that a married woman was protected by coverture from personal liability upon a contract. The question before the court was whether this law should be abrogated due to the fact that the transaction was with the federal government.

The Fifth Circuit held that the Texas law applied to contracts with the United States:

> In short, this is not a case like the cases relied on by the United States of federal commercial paper issued by and as an obligation of the United States. This is a simple case of trying to hold a married woman liable on a contract which under the laws of Texas she was incapable of making, and the claim is no more reasonable than to hold that a minor, or one of unsound mind, could be liable on a contract despite his disability merely because the United States was a party to it.

(334 F.2d at 455)

In so holding, the Fifth Circuit rejected "as without authority here the opinion of the Sixth Circuit, in *United States v. Helz*, 314 F.2d 301." (334 F. 2d at 456)

The holding of the Fifth Circuit was affirmed by the Supreme Court in *United States v. Yazell*, 382 U.S. 341, 86 S. Ct. 500, 15 L.Ed.2d 404 (1966). The only reference to the *Helz* case in this opinion is contained in a footnote which shall be discussed *infra*. In order to determine whether the Supreme Court *Yazell* opinion is controlling in the case at bar, it is necessary to carefully examine some of the language of that opinion.

After detailing the background facts leading up to the loan, the Court went on:

> From the foregoing, it is clear (1) that the loan to Yazell was individually negotiated in painfully particularized detail, and (2) that it was negotiated with specific reference to Texas law including the peculiar acknowledgment set forth above. None of the prior cases decided by this Court in which the federal interest has been held to override state law resemble this case in these respects; the differences are intensely material to the resolution of the issue presented. (382 U.S. at 345–346, 86 S.Ct. at 503)

The Court noted that (1) the SBA was aware and was chargeable with knowledge that the contract would be subject to the Texas law of coverture; (2) none of the parties entered the contract with any thought that the defense of coverture would be unavailable; and (3) the United States was seeking "the unconscionable advantage of recourse to assets for which it did not bargain." (382 U.S. at 346, 86 S.Ct. at 503) The Court also noted that it was the practice of the SBA to routinely require the wife's signature.

> If it had been intended that the result now sought by the Government would obtain, simple fairness as well as elementary craftsmanship would have dictated that in a Texas agreement the wife be advised, at least by former notation, that she was, in the opinion of SBA, binding her separate property, despite Texas law to the contrary. Again it must be emphasized that this was a custom-made, hand-tailored, specifically negotiated transaction. It was not a nationwide act of the Federal Government, emanating in a single form from a single source. [15]

(382 U.S. at 347–348, 86 S.Ct. at 504)

It was at this point, in footnote 15, that the Court made reference to the *Helz* case. It suggested a comparison with the *Helz* case which arose under the National Housing Act "which issues separate forms for each State but does not negotiate with individual applicants."

The Court then turned to the basic question—whether a "federal interest" existed in collecting from the wife's separate property which warranted overriding the state law. The Court noted the government's interest in collecting its loans, but remarked that all creditors had this interest and that the preferences and priorities of the United States were not absolute.

> Our problem remains: whether in connection with an individualized, negotiated contract, the Federal Government may obtain a preferred right which is not provided by statute or specific agency regulation, which was not a part of its bargain, and which requires overriding a state law dealing with the intensely local interests of family property and the protection (whether or not it is up-to-date or even welcome) of married women.

382 U.S. at 349, 86 S.Ct. at 505)

At 382 U.S. 350, 86 S.Ct. at 506, the Court rephrased the issue again and stated as follows:

> The issue is whether the Federal Government may voluntarily and deliberately make a negotiated contract with knowledge of the limited capacity and liability of the persons with whom it contracts, and thereafter insist, in disregard of such limitation, upon collecting (a) despite state law to the contrary relating to family property rights and liabilities, and (b) in the absence of federal statute, regulation or even any contract provision indicating that the state law would be disregarded.

As indicated by the above quotations, the Court was especially mindful of the fact that no statute or regulation existed authorizing the overriding of state law. Again at p. 352, 86 S.Ct. at p. 506, the Court noted this absence and went on to

discuss the crucial issue of the interests involved:

We do not here consider the question of the constitutional power of the Congress to override state law in these circumstances by direct legislation or by appropriate authorization to an administrative agency coupled with suitable implementing action by the agency. We decide only that this Court, in the absence of specific congressional action, should not decree in this situation that implementation of federal interests requires overriding the particular state rule involved here. Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements. They should be overridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied.

Each State has its complex of family and family-property arrangements. There is presented in this case no reason for breaching them. We have no federal law relating to the protection of the separate property of married women. We should not here invent one and impose it upon the States, despite our personal distaste for coverture provisions such as those involved in this case. Nor should we establish a principle which might cast doubt upon the effectiveness in relevant types of federal suits of the laws of 11 other States relating to the contractual positions of married women, which, as the Government's brief warns us, would be affected by our decision in the present case. Clearly, in the case of these SBA loans there is no "federal interest" which justifies invading the peculiarly local jurisdiction of these States, in disregard of their laws, and of the subtleties reflected by the differences in the laws of the various States which generally reflect important and carefully evolved state arrangements designed to serve multiple purposes.

(382 U.S. at 352–353, 86 S.Ct. at 506).

In conclusion the Court stated as follows:

Generally, in the cases applying state law to limit or condition the enforcement of a federal right, the Court has insisted that the state law is being "adopted" as the federal rule. Even so, it has carefully pointed out that this theory would make it possible to "adopt," as the operative "federal" law, differing laws in the different States, depending upon the State where the relevant transaction takes place.

Although it is unnecessary to decide in the present case whether the Texas law of coverture should apply *ex proprio vigore*—on the theory that the contract here was made pursuant and subject to this provision of state law —or by "adoption" as a federal principle, it is clear that the state rule should govern. There is here no need for uniformity. There is no problem in complying with state law; in fact, SBA transactions in each State are specifically and in great detail adapted to state law.

Justice Harlan concurred in the opinion of the Court but noted that he placed no reliance on any of the particularities of the negotiations. In his view, application of Texas law was justified by the appraisal of the competing state and federal interests involved, regardless of whether the parties had negotiated with reference to Texas law.

In dissent, Justices Black, Douglas and White adopted the dissenting opinion of Judge Prettyman in the Court of Appeals who would have followed the *Helz* case.

Before any in depth analysis of the *Yazell* opinion, and its possible effect on the reasoning contained in *Helz*, is presented, it is best to set forth the

SBA regulation promulgated subsequent to the *Yazell* decision.

13 CFR 101.1(d)(1)–(4)

Allegedly in reaction to the Supreme Court's ruling in *Yazell*, the SBA promulgated a regulation which the government contends renders the state law defense of coverture inapplicable and unenforceable in transactions involving the SBA. The government presumably contends that this regulation overrides the *Yazell* decision, although the government does not concede that *Yazell* is applicable to the case at bar in any event. The provisions of 13 CFR 101.1(d)(1)–(4) read as follows:

> (d) *Applicable law.* (1) Loans made by SBA are authorized and executed pursuant to Federal programs adopted by Congress to achieve national purposes of the U. S. Government.
>
> (2) Instruments evidencing a loan, obligation of security interest in real or personal property payable to or held by the Administration or the Administrator, such as promissory notes, bonds, *guaranty agreements*, mortgages, deeds of trust, and other evidence of debt or security *shall be construed and enforced in accordance with applicable Federal law.*
>
> (3) In order to implement and facilitate these Federal loan programs, the application of local procedures, especially for recordation and notification purposes, may be utilized to the fullest extent feasible and practicable. However, the use of local procedures shall not be deemed or construed to be any waiver by SBA of any Federal immunity from any local control, penalty, or liability.
>
> (4) Any person, corporation, or organization that applies for and receives any benefit or assistance from SBA, *or that offers any assurance or security upon which SBA relies for the granting of such benefit or assistance, shall not be entitled to claim or assert any local immunity to defeat the obligation such party incurred in obtaining or assuring such Federal benefit or assistance.*

(Emphasis added)

According to the government's brief, these regulations were effective as of July 26, 1966 and appeared in the Federal Register on August 4, 1966. The guarantee agreement involved in the case at bar was executed on June 14, 1973.

## DISCUSSION

(1) The *Helz* case, as Sixth Circuit law, would be controlling unless (a) it is distinguishable from the case at bar or (b) it is in conflict with the Supreme Court decision in *Yazell*; in which case (2) the *Yazell* case would control unless (a) it is distinguishable from the case at bar or (b) its result has been changed by the SBA regulation; in which event (3) the SBA regulation would control. The problem confronted by this court is to analyze these various possibilities.

The starting point for this inquiry must be with the *Yazell* opinion since it is, as far as the court is aware, the most recent pronouncement by the Supreme Court on this issue. Although that opinion contains policy discussion which is certainly applicable to the case at bar, the Court seemed to rely heavily on the particular facts of that case and its ruling may be specifically limited to those, or similar facts. It is thus important to compare the material facts of that case with the facts in the case at bar and determine whether any differences are significant and may compel a different result.

It should be emphasized that in *Yazell,* the Supreme Court noted "(1) that the loan to Yazell was individually negotiated in painfully particularized detail, and (2) that it was negotiated with specific reference to Texas law" and that these factors, which were different from prior

cases where state law had been overridden were "intensely material to the resolution of the issues presented." The Court also made specific reference to the fact that *Yazell* concerned a "custom-made, hand-tailored, specifically negotiated transaction" in which the wife was not advised, even by formal notation, that she was, in the opinion of the SBA, binding her separate property despite Texas law to the contrary. The Court made the distinction between the *Yazell* situation and those situations in which there was no negotiation with individual applicants, such as in *Helz*. It is not clear whether this was considered a controlling distinction. The Court's opinion was also specifically limited to those situations where there existed no federal statute or regulation indicating that state law would be disregarded.

In the case at bar, the court does not really have information from which it can determine whether the guaranty agreement was specifically negotiated although no contention is made that it was so negotiated and it is a reasonable presumption that at least the SBA did not specifically negotiate the guaranty agreement although Mrs. Nixon knew or should have known that SBA was involved in the transaction. The actual loan was made to The Haycon Corporation by the Fidelity Bank of Michigan. The SBA merely guaranteed the loan. Apparently in order to obtain this SBA guaranty, personal guarantors were also required. The Nixons were such guarantors and they submitted a Personal Financial Statement to the SBA, which Statement contained a provision above the signature that the financial statement was submitted for the purpose of "inducing SBA to grant a loan . . . " Thereafter, an actual guaranty was executed on an SBA form, entitled "Small Business Administration (SBA) Guaranty." This factual setup is different than the *Yazell* situation in which the SBA actually made the loan and negotiated the terms.

A second difference between the case at bar and the *Yazell* decision is that here, Mrs. Nixon was at least implicitly notified that the SBA considered her to be binding her separate estate. The guaranty agreement contains the following provisions:

"The term 'Undersigned' as used in this agreement shall mean the signer or signers of this agreement, and such signers, if more than one, shall be jointly and severally liable hereunder. The Undersigned further agrees that all liability hereunder shall continue notwithstanding the *incapacity*, lack of authority, death, or disability of any one or more of the Undersigned . . . " (Emphasis added)

Although this statement does not specifically spell out the fact that under Michigan law Mrs. Nixon had the defense of coverture but that the SBA considered that defense to be unavailable in the transaction, it did inform the parties that the SBA did not consider incapacity to be a defense. This is factually different from the *Yazell* situation.

Finally, a federal regulation was in existence which authorized the displacement of state law. Subdivision (d)(2) of that regulation provided that the guaranty would be construed and enforced according to federal law. Of course, this does not answer the question of whether Michigan law would be considered (adopted) as federal law. However, subdivision (d)(4) specifically states that the guarantor would not be entitled to assert any local immunity to defeat the obligation incurred.

The power of a regulation to displace state law was recognized in *United States v. Shimer*, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961). In that case, the Veterans' Administration (VA) guaranteed part of a loan to a veteran. Upon default, the VA paid the lending institution the entire guaranty and then sought to recover this sum from the veteran upon a theory of indemnity. The

theory of subrogation was not pressed. In order to determine whether or not the government was entitled to indemnity, it was necessary to decide whether the VA had been obligated to pay the lending institution, for no right to indemnity would otherwise exist. Under Pennsylvania law, the state where the transaction took place, both the VA and the veteran had been released from any liability at the time the VA paid the lending institution. This law was inconsistent with the regulations promulgated by the VA. (The Home Loan Report signed by the veteran and the Guaranty signed by the VA stated that the rights of the parties would be governed by the applicable VA regulations.) The government contended that the regulations should take precedence over the inconsistent state law, and that thus an obligation to honor the guaranty existed and the VA was entitled to indemnity. The Supreme Court agreed.

The Court stated that the regulations were intended to create a uniform system for determining the Administrator's obligation as surety and that they were intended to displace state law. It also held that the Servicemen's Readjustment Act authorized the Administrator to displace state law by promulgating the regulations. Footnote 9 of the opinion sets forth the pertinent statute in this regard:

■ Section 504 of the Act provides:

"The Administrator is authorized to promulgate such rules and regulations not inconsistent with this title, as amended, as are necessary and appropriate for carrying out the provisions of this title, and may delegate to subordinate employees authority to issue certificates, or other evidence, of guaranty of loans guaranteed under the provisions of this title, and to exercise other administrative functions hereunder."

(367 U.S. at 381, 87 S.Ct. at 1560)

The Court went on to set forth the standard of review in such circumstances:

More than a half-century ago this Court declared that "where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong." (Citation omitted)

(367 U.S. at 381–382, 81 S.Ct. at 1560)

The Court noted that the Administrator could have chosen to take advantage of laws such as the one in Pennsylvania, but that he chose not to do so. "If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." (367 U.S. at 383, 81 S.Ct. at 1560) The Court concluded that the regulation met this standard and held that it applied rather than the inconsistent state law.

It is important to note that with regard to the case at bar, 15 U.S.C. § 634(b)(6) gives the Administrator the power to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to this chapter." As in the *Shimer* case, this statute appears to give the Administrator the power to displace state law; subject of course to the courts' determination that the promulgated regulation is reasonable and not one which Congress would have disapproved.

The record here is inadequate to make such a determination. And the *Yazell* court did not consider or decide "the

**404**

question of the constitutional power of Congress to override state law *in these circumstances* by direct legislation or by appropriate authorization to an administrative agency coupled with *suitable* implementing action by the agency." (Emphasis added) For that reason this court does not exclusively rely on the existence of the SBA regulations in ruling on this motion although the court believes that such reliance would have been appropriate if the proper determination could have been made.

However, the court believes that the factual differences discussed above, including to some extent the existence of the regulation, are important and cast this case in a light different from that confronted by the Supreme Court in *Yazell*. As stated above, the policy discussion contained in *Yazell* is applicable to the case at bar. But this court reads the majority opinion in *Yazell* as placing the most emphasis on certain facts which do not appear in the case at bar. Thus, the court believes that *Yazell* is distinguishable and not here controlling. It should also be noted that in *Yazell* there was nothing to hinder the SBA from securing liability on the separate estate of the wife. Texas law provided that she could waive her defense of coverture by application to a court. SBA, who had negotiated the loan with respect to Texas law, did not take advantage of this provision. The court is aware of no similar provision contained in Michigan law. Thus, policy considerations may be slightly different in the two situations. The court further believes that *Yazell* does not overrule the *Helz* case. Application of *Helz* to the case at bar mandates a denial of the defendants' motion.

The defendants' motion to exempt the separate property of Marjorie J. Nixon from liability in plaintiff's summary judgment is denied.

An appropriate order shall be submitted.