**UNITED STATES of America, Plaintiff,**

v.

**William E. CAWLEY and Berniece B. Cawley, his wife, Leroy John Score and Willa Y. Score, his wife, and Cathryn H. Pike, widow of James L. Pike, now deceased, and Edward L. Merseth and Wanda W. Merseth, his wife, Defendants.**

Civ. No. C–76–18.

United States District Court, E. D. Washington.

Jan. 9, 1979.

James J. Gillespie, U. S. Atty., Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for plaintiff.

Jerry J. Moberg, Ries & Kenison, Moses Lake, Wash., for defendants.

## MEMORANDUM

FITZGERALD, District Judge, sitting by designation.

The action was brought by the United States to recover money allegedly owed by the defendants, all of whom are guarantors to a Small Business Administration (SBA) loan made to a Washington corporation, Archdomes, Inc., (hereinafter "Archdomes").

As was noted in findings made on the record in this action, Seattle First National Bank received Archdomes' note on June 30, 1971. The loan of $350,000 was disbursed to Archdomes on July 2, 1971, with the first payment scheduled for the end of August, 1971, with 120 equal monthly payments and annual interest of 7¾%. The first and second payments were made. However, after October, 1971, Archdomes fell delinquent. Although the terms of the SBA bank agreement required Seattle-First National Bank to notify the SBA within thirty days of delinquent payments, for eleven months the bank failed to notify the agency. In early September, 1972, the SBA made a specific written inquiry about delinquency to the bank manager in charge of the loan and on September 19, 1972, the SBA finally received notice of the delinquent account. Fourteen months later, November 21, 1973, the agency purchased the loan from Seattle-First National Bank and on December 19, 1973, the SBA made demand on the guarantors. According to the demand, the balance as of October 31, 1973, was $348,435 with interest accruing at 7¾% annually. Because of the bank's delay in notifying the SBA, the agency held the bank liable for interest that accrued during the period of delay. As I noted in the findings, that amount, some $24,710, will be reduced from the total due from the guarantors to the agency.[1]

## I.  LIQUIDATION OF COLLATERAL

In addition to making demands on the guarantors, the SBA began to move to liquidate Archdomes' property which had secured the loan and began to investigate the possible liquidation of stock which had also been pledged as collateral for the loan. As noted in the findings of fact, there was considerable dispute about the value of Archdomes' property which was covered by the security agreement. The SBA took the position that the value listed on the security agreement has greatly depreciated whereas the defendants contended that there had been an appreciation in the value of the property. As stated in the findings, since the parties originally agreed to a value of $162,734, that agreed-upon figure is the most reliable value of the property which the SBA moved to liquidate.

### A.  The Commercially Unreasonable Disposition and Its Effect

About the same time that the SBA made demand on the guarantors, the agency contacted an auction company, Morton's Supply, about the potential disposition of the property covered by the security agreement. The disposition was to be handled by Mr. James Poe of Morton's and prior to Christmas, 1973, he went to the warehouse at the Port of Pasco to look over Archdomes' former facilities. The SBA did not provide Mr. Poe with a copy of the security agreement inventory and it is apparent that Mr. Poe considered all property at the Archdomes' section of the warehouse to be covered by the security agreement. On December 26, 1973, the SBA portfolio supervisor wrote Mr. Poe regarding the Archdomes' equipment. The letter, in its entirety, stated:

> This will be your authority to act as our agent to hold a Uniform Commercial Code sale of the personal property of the above firm, now located at the Port of Pasco, or to remove it elsewhere for a future sale.

1.  In a post-trial affidavit the government has stated that this amount and more was properly credited to Archdomes' account. This matter will be set for hearing.

It is apparent from that letter and the subsequent letter of January 26, 1974, from the agency to Mr. Poe, that the SBA was instructing Poe to sell all equipment at the warehouse. As was outlined in the findings, Poe moved rapidly to sell the equipment even though storage space was available at the Port of Pasco. There was no advertisement of the sale and there was very little effort by Mr. Poe as agent of the SBA to locate potential purchasers for the Archdomes' equipment. There was an additional failure to comply with a requirement of Uniform Commercial Code, § 9–504(3), as the debtor, Archdomes, was not given notice of the sale.

It is against this factual backdrop that the effect of SBA's sale on the amount of Archdomes' deficiency must be considered. On the threshold question of whether federal or state law defines the rights of the parties, it should be noted that although some circuits have held[2] that when there is a "sufficient federal interest" federal law is applicable to SBA negotiated loans, the Ninth Circuit en banc considered the state and federal policies at stake as required by *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966) and held that a district court should apply applicable state law. *United States v. MacKenzie*, 510 F.2d 39 (9th Cir. 1975). Thus, Washington's statutes and case law are determinative.

Additionally, should a situation arise which has not been specifically addressed by Washington's highest court, I conclude that disposition of the issue must be founded on a projection of the existing Washington law.

The duty of a secured creditor to dispose of collateral in a commercially reasonable manner is found at Revised Code of Washington 62A.9–504[3] and the Washington Supreme Court has established the standards for such commercial reasonableness in *Foster v. Knutson*, 84 Wash.2d 538, 527 P.2d 1108, 1114–15 (1974), which include adequate notice of the sale to the debtor and the public. Under these standards, the SBA sale of Archdomes' collateral constituted a commercially unreasonable sale.

However, Washington's highest court has not yet enunciated the effect of a commercially unreasonable disposition on a debtor's deficiency. The parties contend that this court should be guided by the decisions of two lower Washington courts, *Grant County Tractor Co. v. Nuss*, 6 Wash. App. 866, 496 P.2d 966 (1972) and *Commercial Credit Corporation v. Wollgast*, 11 Wash.App. 117, 521 P.2d 1191 (1974). Those cases, as well as *Mount Vernon Dodge, Inc. v. Seattle-First Nat. Bank*, 18 Wash.App. 569, 570 P.2d 702 (1977), are distinguishable

**2.** For example, see *United States v. Beardslee*, 562 F.2d 1016, 1022 (6th Cir. 1977) which holds that the recent promulgation of federal regulations pursuant to Congressional authority provides the "federal interest" which was found lacking in *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), and Chief Judge Coffin's opinion in *United States v. Olsen*, 515 F.2d 1269, 1271 (1st Cir. 1975).

**3.** The relevant portions are as follows:
"62A.9–504 Secured party's right to dispose of collateral after default; effect of disposition. (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .
"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

in fact and law from the instant action, in that they do not directly address the issue of whether the value of the collateral may offset all or part of a deficiency when the debtor has not been given notice of the sale and when the secured creditor is otherwise derelict in the collateral disposition. Further, the questions left open by the Washington Supreme Court in *Foster v. Knutson, above,* cannot be definitively answered by lower Washington courts.[4] Upon reviewing the language and the holdings in *Foster v. Knutson* and in the three courts of appeal cases noted above, I conclude that were the Washington Supreme Court to face this issue of no notice to the debtor and a commercially unreasonable disposition, the court would hold that the secured creditor faces a rebuttable presumption that the value of the collateral is at least equal to the amount of the outstanding debts.

The Alaska Supreme Court has recently addressed some of the same issues presented by the sale of the Archdomes' equipment in the case of *Kobuk Eng., Etc. v. Superior Tank & Const.,* 568 P.2d 1007 (1977), and that well-reasoned decision extensively reviews the authorities in this area:

> The next question deals with the effect of a sale of collateral which is not conducted in a commercially reasonable manner. Some authorities hold that the creditor is not entitled to any deficiency judgment against the debtor. For example, Anderson in his treatise on the Uniform Commercial Code states: "The creditor is not entitled to a deficiency judgment unless the sale of the collateral was conducted in a manner which was commercially reasonable." [4 Anderson, U.C.C. § 9–504:28 at 623 (1971)] Apparently, this is the view of the majority of the courts which have passed on the question. [See *Clark Leasing Corp. v. White Sands Forest Products, Inc.,* 87 N.M. 451, 535 P.2d 1077, 1081 (1975).]
>
> However, we consider this apparent majority view to be repugnant to the spirit of the UCC. We agree with the

Supreme Court of New Mexico, which has stated:

> The complete denial of the deficiency smacks of the punitive and is directly contrary to Article Nine's underlying theme of commercial reasonableness. 'If the secured party has reimbursed the debtor for any losses incurred by improper sale, he has approximated the commercially reasonable sale. Thus, he should be allowed to receive the money which would have been due if the sale had been commercially reasonable.' [*Clark Leasing Corp.* [535 P.2d] at 1081–82]
>
> We hold that the commercially unreasonable sale made by [the secured creditor] acts to decrease the amount of the deficiency judgment which [the creditor] is entitled to recover from [the debtor]. The fair and reasonable value of the collateral at the time of repossession should be offset against the balance due on the security agreement. Where the collateral has been sold in a sale that does not comply with the provisions of the UCC, there is a rebuttable presumption that the fair and reasonable value of the collateral is at least equal to the amount of the outstanding debt. In order to overcome that presumption, the secured party has the burden of either (1) obtaining a fair and reasonable appraisal at or near the time of repossession, or (2) producing convincing evidence of the value of the collateral. In order to meet the latter burden, the secured creditor is required to bring forward proof of the condition of the collateral and the usual price of items of like condition.

*Kobuk Eng., Etc.* at 1013–14 [footnotes omitted].

██ Here, the SBA did not have to resort to the collateral but could have gone directly against the guarantors for the deficiency. However, since the SBA chose to dispose of the collateral, it was required to carry out that sale in a commercially reasonable manner. Given the unreasonable disposition

---

**4.** Washington is divided into three judicial divisions with each division having a Court of Appeal. Those courts are immediately under the Washington Supreme Court.

which occurred, it became incumbent upon the SBA to establish the "fair and reasonable value of the collateral at the time of repossession." At trial, however, insufficient evidence was introduced by the government to establish the value of the collateral when the SBA repossessed. Rather, the government asserted that the value of the inventoried collateral had greatly decreased from the value previously agreed upon, but offered no proof of that decrease. Accordingly, I found that the value of the collateral at the time of the commercially unreasonable sale was the previously agreed upon value of $162,734. Such a holding rebuts the presumption that the entire deficiency is extinguished by the collateral improperly disposed of at the sale, and the established value must be used to offset the existing deficiency. The deficiency at the time of the sale should be reduced by $162,734 as of February 1, 1974, the approximate date of the sale.

### B. *Related Matters*

In order to determine the full amount that the deficiency should be reduced it is also necessary to consider two additional matters. The sale by Morton's Supply netted $12,043, however the SBA used $7,262 of those receipts to satisfy a tax lien owed by Archdomes. After paying off the tax lien and applying the remaining $4,780, the value of the collateral "credit" is thus reduced to $150,691. The remaining matter pertains to the Archdomes' demonstration model located near the Pasco warehouse. Although that building prototype was not carried on the inventory of the security agreement, it was mistakenly disassembled by Morton's Supply and sold. In my findings I place a value of $5,000 on that building and that $5,000 shall be credited to Archdomes as of February 1, 1974. The amount due on February 1, 1974, shall be reduced by the sum of $155,691 as of that date.

### C. *The Data Pathing-NCR Stock*

In addition to the pledged equipment carried on the security agreement, the Archdomes loan was secured by 13,350 shares of Data Pathing, Inc. stock. After the default, the stock was transferred to the SBA. In June of 1976 Data Pathing merged with National Cash Register, and the 13,350 shares of Data Pathing were converted into 5,444 shares of NCR stock. The SBA then sold the 5,444 shares of NCR on the New York Stock Exchange, recognizing a net recovery of $199,831. That amount was applied against the balance of the deficiency effective September 30, 1976. Neither the amount of that recovery nor the fact that the recovery reduces the amount due from the individual guarantors is disputed by the parties.

## II. THE UNREASONABLE SALE AND THE GUARANTORS

Finally it is necessary to address the parties' remaining dispute: the effect of the SBA's sale of Archdomes' Pasco equipment on the guarantors' obligation to reduce the remaining deficiency. The government asserts that even if the sale were commercially unreasonable, only the debtor (Archdomes) can benefit from any extinguishing of the deficiency. Not surprisingly, the defendant guarantors strenuously maintain that under Washington law the deficiency obligation of the guarantors is likewise reduced by the commercially unreasonable conduct of the SBA.

Each of the guarantors signed a guaranty in the following terms:

#### General Guaranty

In consideration of financial accommodations given or to be given to *Archdomes Inc.* (herein called the Customer) By SEATTLE–FIRST NATIONAL BANK (herein called the Bank), and in consideration of the Bank's agreeing to deal with the Customer, the undersigned, on behalf of themselves and of the marital communities consisting of themselves and their respective wives, if married, hereby jointly and severally guarantee payment to the Bank of all liabilities and indebtedness which the Customer has incurred or is under or may incur or be

under to the Bank, whether arising from dealings between the Bank and the Customer or from other dealings by which the Bank may become in any way a creditor of the Customer.

The Bank may apply all money received from the Customer or otherwise or from collateral upon such part of the Customer's indebtedness as the Bank may think best, without in any way limiting or lessening the liabilities of the undersigned under this guaranty.

*The Bank shall not be bound to exhaust its recourse nor to take any action against the Customer or other parties or on the collateral it may hold before being entitled to payment by the undersigned of all amounts hereby guaranteed, but may make such demands and take such actions as it deems advisable.*

This shall be a continuing guaranty and shall be binding without notice to the undersigned of its acceptance, and shall cover all liabilities which the Customer may incur or be under until the undersigned shall have given the Bank notice in writing to make no further advances on the security of this guaranty; provided that such notice by any one or more of the undersigned or other guarantor shall not lessen nor diminish in any way the liability of the undersigned on any indebtedness or liability incurred prior to receipt by the Bank of such notice, nor lessen nor diminish the liability of others of the undersigned who shall not give such notice; and in the event of such notice the Bank may cease to make any further advances to the Customer.

Notice of default on the part of the Customer is hereby waived; and the undersigned jointly and severally agree to remain bound notwithstanding any extensions or renewals of any indebtedness or the liabilities hereby guaranteed or

any part thereof; and consent is hereby given to the Bank to make such renewals and extensions as the Bank at its option may choose to grant or accept; and the Bank may at its option further compound and settle with the Customer or any of the undersigned or other guarantor and surrender any securities which it may now or hereafter hold belonging to the Customer, without notice to any of the undersigned and without affecting in any way the obligations of any of the undersigned to the Bank.

If the Customer is a corporation, the undersigned guarantee and represent that they are stockholders, or directors or officers and/or are financially interested in the Customer, and if married, their marital communities are so interested. [Emphasis added]

All rights of enforcement of the guaranty have been properly assigned from Seattle-First National Bank to the agency.

The government argued both at trial and in its post-trial memorandum that the case of *First National Park Bank v. Johnson,* 553 F.2d 599 (9th Cir. 1977) controls the present action.[5] However, that case is not applicable since it interprets Montana rather than Washington law. Further, the implication of that panel's holding is that while ordinarily a guarantor is not afforded the same protections as a debtor, "willful or grossly negligent waste or misconduct"[6] by a repossessing creditor may expand U.C.C. protections to guarantors. The defendant guarantors simply argue that *First National Park Bank* is factually different from this litigation and, thus, should not be considered.

■ No case has been found dealing with this issue in Washington but it is clear that under Washington law a guarantor may waive certain defenses. *Fruehauf Trailer*

---

**5.** In *First National Park Bank,* the secured creditor bank failed to give notice to the debtor before repossessing the collateral airplanes. The bank sold the aircraft in a sale the trial court found to be commercially reasonable and then moved against the guarantors for the deficiency. The Court of Appeals affirmed that as

the guarantors had, under the guaranty, waived their right to notice and as there was an absence of willful or grossly negligent conduct by the secured creditor, the guarantors were liable for the deficiency.

**6.** *First National Park Bank* at 602.

*Co. of Canada, Ltd. v. Chandler,* 67 Wash.2d 704, 409 P.2d 651 (1966). In *Fruehauf* several stockholders partially guaranteed a conditional sales contract of trailers to their corporation, PIX. When PIX defaulted Fruehauf repossessed all the trailers and then discharged PIX from its liability on the conditional sales contract as having "been fully paid and satisfied." *Fruehauf,* 409 P.2d at 653.

After Fruehauf disposed of the trailers, it then moved against the guarantors for some $12,000. The guarantors defended on the basis that when the obligation of the principal had been satisfied, the liability of the guarantors are extinguished. While Fruehauf conceded this point, it argued that the guarantors had explicitly waived their rights to this defense and at trial Fruehauf made an offer of proof that it had incurred $12,000 in expenses after re-sale of the trailers. The trial court rejected the offer of proof but on appeal the Washington Supreme Court reversed, holding that the defense was not available to the guarantors when the guaranty contained clear language of waiver and stated "a fixed or determinable amount" for which the guarantors would be liable. As the guarantors had agreed to such an amount— 10% of the loss—the Washington court emphasized that guarantors could indeed waive such defenses and ordered a new trial and a judgment consistent with the holdings of the appellate court.

■ While *Fruehauf* offers limited support for the government's position that the Archdomes' guarantors waived the defense of the partial extinguishing of Archdomes' obligation, the case offers little guidance for situations such as this one. In *Frue-*

*hauf,* there was no evidence that the repossession and re-sale violated Washington's U.C.C. statute; here, not only was no notice given to the debtor of the sale of the goods, but it is obvious from the trial testimony that virtually no effort was made to locate buyers for the equipment. Not surprisingly, the resulting sale produced less than ten cents on the dollar.

I conclude the Supreme Court of Washington would agree with the implication of Judge Kennedy's holding in *First National Park Bank* that given the grossly negligent misconduct and resulting waste produced by the commercially unreasonable sale, the responsibilities of the guarantors of the Archdomes' loan are reduced by the same amount as the debtor.[7] I find that the contrary result would contravene the spirit of the Washington U.C.C. statute, for if a secured creditor could always recover against the guarantors, there would be no restraints on a repossessing secured creditor whenever there were guarantors. Such a creditor would know that no matter how commercially outrageous the repossession and resale, the guarantors would always be liable for the resultant deficiency. I conclude that the obligation of the guarantors must be reduced by the same amount, $155,-691, as the obligation of the debtor. This reduction will also date back to February 1, 1974.

The defendants have moved for a limited new trial and to strike the affidavit of Robert Wiebe. These two motions and the matter of the $24,700 interest payment will be set for a hearing at a time convenient for the Court and counsel.

SO ORDERED.

7. In considering a similar set of facts, Judge Godbold noted:

A guarantor, who is in broad terms a type of surety, has a beneficial interest in collateral held by the creditor for the principal debt, and the creditor must exercise good faith in preserving, applying and disposing of the security and the proceeds, not only for the sake of the creditor's security but in recognition of the guarantor's obligation. Misapplication of security is a defense to the guarantor in an action against him on his obligation. The guarantor cannot compel the creditor to go against the security (and the guaranty so states), but once the creditor does so he must do so without negligence and with due regard for the guarantor's interest in preservation of it and disposition of it for a proper value, for had the creditor not gone after the security the value of it would be subject to the guarantor's rights as subrogee of the creditor. [Footnotes omitted.]
*Frederick v. U. S.,* 386 F.2d 481, 486 (5th Cir. 1967).