[No. 8458–2–III. Division Three. June 28, 1988.]

EMPIRE SOUTH, INC., *Respondent,* v. STEVEN W. REPP, ET AL, *Appellants.*

*Timothy Esser* and *Irwin, Friel & Myklebust,* for appellants.

*Ronald Webster* and *Hickman, Webster, Ensley & Carpenter,* for respondent.

McINTURFF, C.J.—Mr. and Mrs. William Repp and their son, Steven Repp, appeal a judgment entered against them following their alleged default on a promissory note and a retail installment sales contract. They had signed the note and the contract in connection with their purchase of a used 1976 Allis–Chalmers MH2 combine from Empire South's business predecessor. At issue is whether the Superior Court erred when (1) it employed an objective standard to determine if Empire South had fulfilled its warranty

that the combine would run to the Repps' satisfaction, and (2) it awarded a deficiency judgment against the Repps.

In July 1981, Steven Repp and his father went to McSweeney Tractor Company, a Colfax farm equipment dealer, for the purpose of renting a combine to use to harvest their wheat and barley crops. After discussion with Allen McSweeney, the Repps decided instead to purchase a used combine which at that time was disassembled in McSweeney's shop. The Repps inspected the disassembled machine, and Mr. McSweeney promised to get it field ready and that if something did not work, he would make it work. At some point, he made the statement that he would get it working to the Repps' satisfaction.

The purchase price of the combine, including tax, was $57,750. The down payment of $17,750 was paid $1,000 in cash and $16,750 by a promissory note due on July 1, 1986, signed by Steven and cosigned by his father. The Repps also signed a retail installment sales contract in those same capacities which provided the remaining balance, including interest, was to be paid in four annual installments of $14,378, beginning July 1, 1982.

The Repps experienced problems with the combine during the 1981 harvest which began August 10 and was completed on August 31. The court's findings of fact 4, 5 and 6, to which the Repps do not assign error, summarize these problems:

> 4. . . . Beginning August 8, 1981, the Repps experienced some problems with the machine. On August 8, 1981, Mr. Repp rewired the separator clutch. On August 9, 1981, he put on a new header drive belt and completed adjustments on August 11, 1981.
>
> 5. On August 17, 1981, the alternator went out and McSweeney Tractors sent out it's chief mechanic to replace it at no cost to the Repps. On August 19, 1981, the straw walker went out and McSweeneys dispatched another mechanic to the Repp field to fix the straw walker and to work on a hydraulic accumulator. On August 20 the shaker pan needed work and a mechanic came. On August 21 a mechanic came and worked on the

walker drive and replaced rubber blocks, straw walker blocks, new adjusting rod, spring, belts and idler on hydraulic drive. Later on August 24, 1981, rubber blocks and casting for sieves were replaced. On August 23 and 24 a sieve holding rod was replaced. On August 25, 1981, the Repps experienced some leveling problems and Mr. McSweeney's mechanic again came and fixed the problem. On August 28, 1981, the mechanic again came to the Repp field and fixed a broken sieve rod. On August 29, 1981, McSweeney replaced the walker pan and patched the shoe. Since the shoe is an important part of a combine and there was some question as to whether or not the patch would hold, McSweeneys ordered a replacement shoe and made arrangements to put it on the combine some time before the next harvest season.

6. All of the services performed by McSweeney Tractor Company in 1981 were done at no cost to the Repps for either parts or service. Although there were several problems which occurred during the three week 1981 harvest season, many of them—belts, adjustments, blocks, and castings—are maintenance problems. These are the types of problems that a combine operator might expect to run into periodically during a harvest season. Other problems were unpredictable, such as the alternator going out, the shoe cracking, and the sieve rod breaking. These can and do occur periodically in used machinery.

At the end of the 1981 harvest, William Repp called Allen McSweeney and told him to come get the machine. According to Mr. Repp, he did not expect a reconditioned machine to exhibit the number of problems they in fact experienced with the combine. However, Mr. McSweeney convinced him to give the dealership another chance to make the combine work.

Prior to the due date of the July 1, 1982, installment payment, the Repps negotiated an extension agreement with Empire South, the company which had purchased the McSweeney dealership in October 1981. The agreement extended the payment date to November 1, 1982, in exchange for a $2,000 partial payment and a payment of $825 in extension fees representing interest on the remaining amount from July until November.

Finding of fact 10, to which no error is assigned, summarizes the Repps' problems with the combine in the 1982 harvest season:

10. . . . The 1982 harvest started on August 10. Several days of the first week of harvest were rainy and little harvesting was done on those days. On August 10, 1982, [the Repps] replaced straw chopper bearings, and on August 11, 1982, Defendants put new guards on the combine. On August 16, 1982, a hose burst. On August 17, 1982, the replacement hose burst. On that date Steven Repp told Mr. Conger of Empire South that the hose had burst on several prior occasions, and that he wanted Mr. Conger to come out and take the machine back.

Instead, Mr. Conger and a mechanic worked on the combine, and Mr. Conger operated it for about a half a day in the field on August 19. The Repps refused to use it after August 19, citing their fear that the machine was unsafe and might tip over. Steven Repp said that when the hose burst the last time, he was working on a hillside and the leveling device stopped. This frightened him, and he never got on the machine again.

Bill Conger stated the Repps never said anything to him about returning the machine until August 17 when they experienced the leveling problem. He further stated this problem was due to worn O–rings. He replaced the O–rings the next day, and he testified the action solved the problem.

Mr. Conger repossessed the machine in September 1982. He placed it on his lot, and offered it to several people who were looking for combines during the fall of 1982. However, it was not until January 1983 that he received the paperwork from the Allis–Chalmers Credit Corporation clearing title so he could advertise the combine for auction. The Repps asked him to wait 30 days before scheduling a public sale, and he complied with their request. No one appeared to bid at the first sale date of April 15. On May 17, 1983, Empire South bought the combine for $33,000, which Mr. Conger states was the high end of the wholesale price

range. The only other bid at the sale was for $15,000. Empire South sold the machine in July 1983 for $35,000.

Mr. Conger said the price of used equipment went down drastically between the fall of 1982 and when the combine was sold. In August 1982, the combine was equal in value to its value on the day it was originally purchased by the Repps, less 125 hours of wear and 2 years of depreciation. No testimony was offered concerning what the combine was worth, in terms of dollars, in August 1982.

The Superior Court found when McSweeney's sold the combine to the Repps, it was operable and safe. When parts wore out, the dealers made repairs at no cost to the Repps. The court characterized the defects as minor and held that the fact problems became apparent during harvest, which was the only time during the year the machine was operated, did not elevate them from minor to substantial status. It concluded:

> Guarantees of satisfaction, absent language defining what that means in the context of the transaction, must be viewed against the backdrop of reasonableness. A combine is an aggr[e]gation of parts that begin to wear out on the day the combine comes out of the factory. . . . A reasonable purchaser under the same or similar circumstances would be aware of that and would not expect a new machine.

Applying this objective standard, the court judged the dealers had not violated their warranties, and the Repps had no cause to revoke their acceptance of the combine. On the other hand, it also concluded Empire South had not disposed of the combine in a timely manner. The court found the Repps had been damaged $6,000 by the delay in the sale. Accordingly, it deducted that sum from the amount the Repps owed on the contract.

Hence, the court entered judgment on March 13, 1987, having concluded Empire South incurred the following damages:

| | |
|---|---:|
| Promissory Note | $16,750.00 |
| Interest | 16,330.52 |

| | |
|---|---|
| Contract | 13,931.37[1] |
| Interest | 8,641.83 |
| Attorney's Fees | 5,629.50 |
| Court Costs | 75.00 |
| Total | $61,358.22 |

First, did the court err when it employed an objective standard to determine whether Empire South had fulfilled its warranty of satisfaction?

On appeal,[2] the Repps argue that a subjective test applies in determining whether a condition of satisfaction

---

[1] This figure represents the deficiency on the contract, *i.e.,* the sum owing after deduction of the amount obtained by Empire South on the sale of the combine and the deduction of $6,000 by the Superior Court to compensate the Repps for the untimeliness of the sale.

[2] At trial, the Repps cited the superior court to Washington cases construing RCW 62A.2–608, the section of the Uniform Commercial Code which permits a buyer under certain circumstances to revoke his acceptance of goods "whose non–conformity substantially impairs its value to him . . ." In *Hays Merchandise, Inc. v. Dewey,* 78 Wn.2d 343, 474 P.2d 270 (1970), the court rejected the buyer's argument that the emphasis in section 2-608 was upon "impairs its value to *him.*" (Italics ours.) Instead, *Hays,* at 347, held:

> We are convinced that the emphasis is properly upon "substantially impairs . . . value" . . . This does not mean that "substantial impairment" is to be determined without reference to the objective needs and expectations of the buyer. *See* RCWA 62A.2–608, Official Comment 2. But it is an objective factual determination *of the buyer's particular circumstances* rather than some unarticulated desires.

(Italics ours.) *See also Blake v. Federal Way Cycle Ctr.,* 40 Wn. App. 302, 306–07, 698 P.2d 578, *review denied,* 104 Wn.2d 1005 (1985); *Massingale v. Northwest Cortez, Inc.,* 27 Wn. App. 749, 752, 620 P.2d 1009 (1980), *review denied,* 95 Wn.2d 1009 (1981). None of these cases concerned a warranty of personal satisfaction.

Here, the Superior Court applied the *Hays* standard when it concluded: "A reasonable purchaser *under the same or similar circumstances* of this case would have been satisfied with the way the machine was running when it was delivered, and after each repair." (Italics ours.) Substantial evidence supports the findings upon which this conclusion is based. While the Repps were unhappy with the number of breakdowns, there was testimony that the problems they encountered could be expected in a secondhand combine. Further, it was uncontroverted that the seller was able to put the combine in working order each time a problem arose.

Empire South contends the Repps did not raise in superior court the issue of whether a subjective test applied. The Repps disagree, relying on testimony by Steven Repp that the combine did not work to his satisfaction. The court reporter

has been fulfilled. "The Code provision most closely analogous to conditions of satisfaction is section 2–326." Note, *Conditions of Personal Satisfaction Under the Uniform Commercial Code: Is There Room for Unreasonableness?*, 42 U. Pitt. L. Rev. 375, 382 (1981). Under RCW 62A.2–326(1):

> Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
> (a) a "sale on approval" if the goods are delivered primarily for use, . . .

Official Comment 1 to the section states, in part: "On the point of 'satisfaction' as meaning 'reasonable satisfaction' where an industrial machine is involved, this Article takes no position." "Because no position is taken, section 1–103[3] would apply and pre–Code contract law would determine the test." (Footnote omitted.) 42 U. Pitt. L. Rev., at 384.

Both parties cite the court to pre–code case law in Washington. In *Tatum v. Geist*, 46 Wash. 226, 227, 89 P. 547 (1907) the agreement stated: "Because machine is not at this store for inspection, we agree to accept return of same, free of expense, . . . provided the machine is not satisfactory." *Tatum*, at 229–30, held:

> The contract is clear, to the effect that appellants would accept a return of the machine if it should prove unsatisfactory to the respondents. . . . Where there is an agreement that an article shall be satisfactory to the buyer, "it is generally held that he [the purchaser] is the

---

was excused during final argument, so we have no record of the parties' arguments there. Since we cannot determine with certainty whether the applicability of a subjective test was presented to the superior court, we have chosen to address the issue.

[3]RCW 62A.1–103 states:
"Unless displaced by the particular provisions of this Title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

sole arbiter of the performance according to the agreement. It is not enough to show that the promisee ought to be satisfied and that his discontent is without reason." 24 Am. & Eng. Ency. Law (2d ed.), p. 1236.

*See also McDougall v. O'Connell,* 72 Wash. 349, 353–54, 130 P. 362, 131 P. 204 (1913); Annot., *Reasonableness or Personal Judgment of Buyer Is Test Where Goods Are Sold Subject to Being Satisfactory to the Buyer,* 86 A.L.R. 2d 200 (1962).[4]

■ In *Yarno v. Hedlund Box & Lumber Co.,* 129 Wash. 457, 225 P. 659, 227 P. 518 (1924) the court distinguished *Tatum,* noting that the rule set forth therein is not favored in the law. *Yarno,* at 469, held: "[W]here the duties of the parties with respect to performance are specifically provided in the contract, dissatisfaction as a ground for its termination will not be recognized unless there is a substantial ground for dissatisfaction . . ."

In *Yarno,* the defendant hired the plaintiff to log standing timber owned by the defendant. Their contract read:

Time of performance is of the essence of this contract and *in case the company is dissatisfied with the progress being made by the Logger under the conditions as set forth in this contract* then the company shall at any time have the right, at the company's option, to either:

"(1) Put additional men and teams on the job to speed up the work at the expense of the Logger; or else

"(2) Terminate this contract . . .

(Italics ours.) *Yarno,* at 461. The contract elsewhere provided in detail the manner in which the logger was to proceed. *Yarno,* at 459–61. These terms furnished a rule or a measure of performance by which it could be determined whether there were reasonable grounds for dissatisfaction or not. *Yarno,* at 470. *See also Gould v. McCormick,* 75

---

[4]The foregoing cases have assumed that the buyer was truly dissatisfied. *Jones v. Hollingsworth,* 88 Wn.2d 322, 329, 560 P.2d 348 (1977) (citing *McDougall* and *Tatum*). Indeed, the Washington Supreme Court "has stated that all contracts contain an implied covenant of good faith." *Jones,* at 329 (citing *Miller v. Othello Packers, Inc.,* 67 Wn.2d 842, 844, 410 P.2d 33 (1966)).

Wash. 61, 134 P. 676 (1913) which awarded damages to architects discharged by an owner under a contract that called for work performed to be satisfactory but also described the character of the architects' work.

Here, the Superior Court found the dealer

> promised to reassemble the machine and to put it in working order. He said he would get it field ready and promised that if something didn't work, he would make it work. At some point, he made the statement that he would get it working to Mr. Repp's satisfaction.

Do the dealer's promises to get the machine "field ready" and "to make it work" if something did not work furnish a measure of performance for his statement that he would get it working to Mr. Repp's satisfaction? We hold "yes". If the parties' intention was to give the Repps the unqualified or arbitrary option to terminate the contract whenever they might be dissatisfied, Mr. McSweeney's specific promises would be entirely superfluous.[5] *See Gould,* at 67.

Thus, an objective test of the Repps' satisfaction was proper, applying the terms of the parties' agreement. The evidence supports the court's findings that the combine was operable when delivered to the Repps, that the problems they encountered could be expected in a secondhand combine, and that the dealers were able to repair the defects that appeared. Accordingly, we affirm the Superior Court's

---

[5]According to the Repps, the Superior Court answered "no" to the question posed at the beginning of this paragraph. They point to finding of fact 18, which states:

> Guarantees of satisfaction, *absent language defining what that means in the context of the transaction,* must be viewed against the back drop of reasonableness.

(Italics ours.) The Repps argue the italicized language is a finding that the guaranty of satisfaction given by Mr. McSweeney was not defined in this contract.

We disagree with the Repps' characterization of the foregoing language. The quoted portion of finding of fact 18 is a statement of law, not a finding of fact. Moreover, it is a misstatement of the law. Under *Tatum* and *Yarno,* the buyer's subjective satisfaction is the sole arbiter of performance when the parties' contract guarantees satisfaction but does not supply terms by which satisfaction can be measured. Nor can we assume from finding of fact 18 that the court found the contract here lacked definitional terms. The court's finding regarding the terms of the warranty is set out in the finding quoted in the text of this opinion.

conclusion that a reasonable person in the Repps' position would have been satisfied with the combine.[6]

Second, did the court err in entering a deficiency judgment against the Repps? The Repps contend that since Empire South did not sell the combine in a timely fashion, a rebuttable presumption exists that at the time of repossession the combine was worth at least the amount owing on the contract.

RCW 62A.9–507(1) provides, in part: "If the disposition has occurred the debtor . . . has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part." Official Comment 1 to that section states: "The principal limitation on the secured party's right to dispose of collateral is the requirement that he proceed in good faith (Section 1–203) and in a commercially reasonable manner. See Section 9–504." Under RCW 62A.9–504(3), "[E]very aspect of the disposition including the method, manner, *time,* place and terms must be commercially reasonable." (Italics ours.)

■ After judgment was entered in this case, RCW 62A.9–507(1) was construed in *Rotta v. Early Indus. Corp.,* 47 Wn. App. 21, 26, 733 P.2d 576, *review denied,* 109 Wn.2d 1012 (1987):

---

[6]The Repps argued that even under an objective standard they had cause to be dissatisfied. They cite to the testimony of Mr. Conger who agreed, in answer to a hypothetical question on cross examination, that a used combine which was operable only 40 percent of the time during the harvest season could not be judged satisfactory. The 40 percent figure is an inference from testimony that harvest season ran for 24 days in 1981, crews worked 10 to 12 hours a day, but the combine only added 98 hours to its meter during that time. However, there was also testimony that the 24–day harvest was interrupted several times by rain. Further, the significance of the number of hours on the meter is questionable because Mr. Repp could not say whether the meter ran the entire time the combine was running or whether it ran only during the time the combine was separating grain. When the record is viewed as a whole, Mr. Conger's testimony does not rebut the substantial evidence that supports the court findings and its conclusion the Repps acted unreasonably when they revoked their acceptance of the combine.

In Washington, a failure to comply with the Uniform Commercial Code requirements regarding sale of collateral will not result in an absolute waiver of a deficiency judgment. *See* [*Grant Cy. Tractor Co. v. Nuss,* 6 Wn. App. 866, 870, 496 P.2d 966 (1972)]. Instead, RCW 62A.9–507(1) allows a debtor to recover his or her losses by setoff against the deficiency judgment. *See Nuss,* 6 Wn. App. at 869–70. This is a case of first impression on the issue of whether the debtor or creditor bears the burden of proving damages caused by the creditor's failure to comply with the Uniform Commercial Code requirements.

*Rotta,* at 27, adopted the analysis of *United States v. Cawley,* 464 F. Supp. 189 (E.D. Wash. 1979), which the Repps had cited to the Superior Court here.

> We hold that the commercially unreasonable sale made by [the secured creditor] acts to decrease the amount of the deficiency judgment which [the creditor] is entitled to recover from [the debtor]. The fair and reasonable value of the collateral at the time of repossession should be offset against the balance due on the security agreement. Where the collateral has been sold in a sale that does not comply with the provisions of the UCC, *there is a rebuttable presumption that the fair and reasonable value of the collateral is at least equal to the amount of the outstanding debt. In order to overcome that presumption, the secured party has the burden of either (1) obtaining a fair and reasonable appraisal at or near the time of repossession, or (2) producing convincing evidence of the value of the collateral. In order to meet the latter burden, the secured creditor is required to bring forward proof of the condition of the collateral and the usual price of items of like condition.*

(Italics ours.) *Cawley,* 464 F. Supp. at 192 (quoting *Kobuk Eng'g & Contracting Servs. v. Superior Tank & Constr. Co–Alaska, Inc.,* 568 P.2d 1007, 1013–14 (Alaska 1977)). We agree with *Rotta*'s analysis.

In its memorandum decision, the Superior Court held:

> *The court was not furnished with evidence by which it could pinpoint the value on September 15, 1982. It was told that after the O–rings were repaired on August 19,*

1982, that the combine was equal in value to the value on the day that it was originally purchased by the Repps, less 125 hours of wear and two years of depreciation. Because of the delay the Court will reduce the amount of the deficiency judgment by $6,000.00. Judgment will be entered against the Repps and in favor of the Plaintiffs in the amount of $23,014.20 for the deficiency.

(Italics ours.)

Under *Rotta* and *Cawley,* a rebuttable presumption exists that collateral sold in a commercially unreasonable manner is worth at least the amount of the debt. Empire South had the burden of rebutting this presumption. While we have evidence that the combine, after repairs, had a value equal to its value when the Repps purchased it, less 125 hours of wear and 2 years of depreciation, we have no evidence of what that value was in terms of dollars. The $6,000 figure by which the Superior Court reduced Empire South's deficiency judgment is not supported by any evidence. We hold Empire South did not rebut the presumption, and the court erred when it entered a deficiency judgment against the Repps.

Empire South argues this court should sustain the deficiency judgment on the ground the sale was timely, contrary to the decision of the Superior Court. Although Empire South has not cross-appealed, we consider its argument under the rule that a reviewing court can sustain a judgment on any ground within the pleading and the proof. *See Lucas Flour Co. v. Local 174, Teamsters, Chauffeurs & Helpers of Am.,* 57 Wn.2d 95, 103, 356 P.2d 1 (1960), *aff'd,* 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962). However, the burden of proving the reasonableness of the sale is also on Empire South. *Rotta,* at 24.

Empire South cites *Swanson v. May,* 40 Wn. App. 148, 697 P.2d 1013 (1985), in which this court held substantial evidence supported the trial court's finding that the secured

party timely disposed of the collateral when he sold it 14 months after repossession. *Swanson* is distinguishable on its facts. Although the secured party in *Swanson* did not advertise at a public sale but marketed the collateral simply by locating it next to a "for sale" sign near a highway bordering his property, the evidence showed the sale was hampered by other factors. That is, the equipment was in a damaged condition and it was necessary for the secured party to repair it, and the farm equipment market was depressed and financing was scarce. *Swanson,* at 154.

Here, the evidence was that the dealers had completed much repair work prior to repossession. While there was testimony the market for this equipment was falling in 1982, the Superior Court was not convinced that this made sale of the combine impossible. The fact Empire South unsuccessfully offered the combine to customers who visited its lot is not proof that the combine was unsalable even at an auction. We stress that the determination of whether a sale is timely is a question for the trier of fact. *Swanson,* at 154 (citing *Service Chevrolet, Inc. v. Sparks,* 99 Wn.2d 199, 204, 660 P.2d 760 (1983)). Substantial evidence supports the Superior Court's finding that the sale here was untimely.

Accordingly, we reverse the deficiency judgment on the contract, but affirm the remainder of the judgment.[7] Both parties have prevailed on a portion of their claims; thus, we hold that both parties will bear their own attorney fees on appeal. The cause is remanded to superior court for a determination of whether Empire South's attorney fees at

---

[7]The judgment for the deficiency on the contract, plus interest, was $22,573.20. The remaining $38,785.02 of the judgment stands, subject to adjustment of the attorney fee award by the superior court, if it determines such an adjustment is necessary.

trial should be reduced as a result of our reversal of the deficiency judgment.

MUNSON and THOMPSON, JJ., concur.

Reconsideration denied August 5, 1988.

Review denied by Supreme Court November 29, 1988.