*169
 

 CORRECTED MEMORANDUM & ORDER
 

 KORMAN, District Judge.
 

 This is a wrongful death action arising out of the crash of a SAM Airlines plane in Colombia, South America, that killed J. Martin Anderson. The decedent is survived by his wife Lisa Anderson and his thirteen-year-old son by a previous marriage, Bradley Anderson. Prior to the accident, the decedent lived in North Carolina with Mrs. Anderson and her son from a previous marriage. Bradley Anderson, who suffers from autism, resides with his mother, Deborah Housworth, in Georgia.
 

 This action was brought pursuant to the Warsaw Convention by Mrs. Anderson as a representative of the decedent’s estate. After agreeing to a $2 million settlement with the defendants, Mrs. Anderson filed a motion asking for an order applying federal common law, rather than North Carolina law, to the allocation of the settlement proceeds. Under a North Carolina statute, N.C.GemStat. § 28A-18-2 (1995), recoveries in wrongful death actions are allocated according to the provisions of the intestacy statute, which in turn accord equal shares to a widow and an only child.
 

 The motion papers are not clear about the degree to which the settlement was contingent on the outcome of the motion. Counsel for Mrs. Anderson initially stated that the settlement was reached “on condition this Court determines the amount to be paid to each beneficiary based on the applicable law.” PI. Lisa Anderson’s Mem. of Law at 1. Counsel further indicated that “determination of the choice of law issue raised by this motion will resolve the present impasse.”
 
 Id.
 
 Defendants, however, characterized the agreement as “subject to an apportionment of the settlement monies by this Court among the claiming beneficiaries.” Defs.’ Mem. of Law at 3. Indeed, this description was later accepted by counsel for Mrs. Anderson.
 
 See
 
 PI. Lisa Anderson’s Reply Mem. of Law at 4. The difference between these accounts, if any, leaves unclear whether the parties had agreed that I should apportion the settlement, or were asking me to decide a choice of law question in order to facilitate settlement.
 

 While I tentatively concluded that federal common law would apply, nevertheless, it also became clear that the resolution of the choice of law issue would not result in a settlement of the case. Accordingly, I granted Mrs. Anderson’s application to try the issue of damages first. The parties then proceeded to take discovery, which consisted mainly of deposing the family of Bradley Anderson, and then agreed upon a distribution of the proceeds of the settlement. By the time a compromise order was submitted for my approval in the spring of 1995, the defendants had increased their offer to $2.15 million, of which Mrs. Anderson would receive $1,850,000 and Bradley would receive $300,000. In other words, Mrs. Anderson had agreed to allocate $150,000 of the original $2 million settlement — equal to 7.5% — to Bradley and defendants had agreed to contribute $150,000 in additional funds. Even when viewed in the context of the total $2.15 million settlement, Mrs. Anderson’s projected share of the recovery would exceed 86%.
 

 According to counsel for Mrs. Anderson, the justification offered for this uneven distribution, with which I informally agreed, could be found in federal common law. Indeed, the compromise order submitted in April of 1996, included a request that I “order” that “the settlement, including distribution, is under federal common law and not the law of North Carolina.” The legal basis for this conclusion, according to counsel for Mrs. Anderson, was squarely established in
 
 In re Air Disaster at Lockerbie, Scotland,
 
 928 F.2d 1267 (2d Cir.)
 
 (“Lockerbie I
 
 ”),
 
 cert. denied,
 
 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). According to Mrs. Anderson’s earlier papers for the choice of law motion,
 
 Lockerbie I
 
 stood for the proposition that “federal law exclusively governs and preempts state law in international aviation disasters such as the one at bar” and provides only for “actual damages.” PI. Lisa Anderson’s Mem. of Law at 1. The bulk of such damages would be calculated based on the loss of economic support, although other bases of recovery would also be available. Because the decedent was legally obligated
 
 *170
 
 to support Mrs. Anderson for life but obligated to provide for his son only until he reached age eighteen, counsel for Mrs. Anderson argued, “[i]n this case, the widow would receive substantially more than the child.” PI. Lisa Anderson’s Mem. of Law at 1.
 

 Even accepting this proffered basis for distributing the settlement, I was concerned that Bradley’s $300,000 share of the settlement was unacceptably low. Particularly significant was its failure to take sufficiently into account the fact that Bradley’s autism would render him in,capable of financial independence as an adult. Indeed, Bradley’s share was precisely equal to the $300,000 that Mrs. Anderson was prepared to set aside for her son by a prior marriage, for whom the decedent provided financial support and who would achieve emancipation at the usual age. After Mrs. Housworth indicated that she would agree to a settlement that would increase Bradley’s share to $355,-000, and after conferring with her, I indicated that I would approve such a settlement. The defendants agreed to contribute half of the additional $55,000, but Mrs. Anderson declined to do so.
 
 [1]
 

 Mrs. Anderson’s refusal to reduce her $1.85 million share by $27,500 necessitated another status conference, which was held on Wednesday, July 24, 1996. At the conference, I observed that there were two disputes here: one between the plaintiffs and the defendants as to the amount of the damages and a second between the plaintiffs inter se as to how that amount should be divided. From the representations contained in the application to approve the settlement, it appeared that a total recovery of $2,177,-500 was reasonable and was acceptable to Mrs. Anderson. While it was substantially less than the economic and other damages suffered by Mrs. Anderson and Bradley Anderson, it reflected the extraordinary difficulty of proving the gross negligence necessary to overcome the $75,000 limitation of liability imposed by the Warsaw Convention.
 
 See
 
 Co-Plaintiff Anderson’s App. For Settlement ¶ 5 (“I have been advised that during the 60 year history of this Treaty, in only eight cases have plaintiffs been successful in evading the damage limitation by proving wilful misconduct.”).
 

 Because Mrs. Anderson appears here as “a trustee in respect to the fund [s]he may recover for the benefit of those entitled eventually to receive it,”
 
 Estate of Below,
 
 12 N.C.App. 657, 660, 184 S.E.2d 378, 381 (Ct. App.1971), she was obligated to accept that amount rather than hold the estate hostage in order to obtain the agreement of the beneficiaries of the recovery to the division of the settlement that she desired in her personal capacity. If need be, a neutral person could be appointed as the representative of the estate to determine whether the case against the defendants should be settled for $2,177,-500.
 
 See Gardner v. Parson,
 
 874 F.2d 131, 138 (3d Cir.1989);
 
 cf.
 
 Austin Wakeman Scott,
 
 Abridgement of the Law of Trusts
 
 § 187.1, at 369 (1960) (‘Where the trustee commits or threatens to commit a breach of trust by an abuse of his discretion ... the court may ... direct the trustee to act where his failure to act is an abuse of discretion; or ... remove him as trustee____”).
 

 If the dispute between the plaintiffs and the defendants was resolved, the dispute between the plaintiffs inter se as to the division of the amount could be resolved by the trier of fact. Alternatively, the $27,500 shortfall could be bridged by reducing the award of fees to Mrs. Anderson’s counsel. The reduction would be justified in part because there was no basis for him to claim a contingency fee on the first $75,000 of the settlement, to which the estate would automatically have been entitled, and because, although he was retained to represent Mrs. Anderson in her fiduciary capacity as the representative of the estate of J. Martin Anderson, he actually represented the potentially conflicting personal interest of Mrs. Anderson.
 
 [2]
 

 See Murray v. Beard,
 
 102 N.Y. 505, 509, 7 N.E. 553, 555 (1886) (holding that
 
 *171
 
 agent forfeits fee when he accepts duties that are “conflicting and incapable of faithful performance by the same person”);
 
 Musico v. Champion Credit Corp.,
 
 764 F.2d 102, 112-14 (2d Cir.1985) (holding that agent forfeits fees for improperly performed tasks);
 
 Viventi v. Cap’n Rick Corp.,
 
 525 F.Supp. 31, 35 (S.D.N.Y.1981) (reducing fee because “it was improper for [attorney] to represent each claimant with respect to the division of the settlement fund”),
 
 ajfd
 
 685 F.2d 423 (2d Cir.1982),
 
 and ajfd sub nom. Shapiro v. Fuchsberg & Fuchsberg,
 
 685 F.2d 426 (2d Cir.1982),
 
 and ajfd sub nom. Viventi v. Cap’n Rick Corp.,
 
 685 F.2d 428 (2d Cir.1982).
 

 I gave counsel an opportunity to persuade me why these alternatives should not be pursued. Near the end of an extensive two-hour conference, Mrs. Anderson’s counsel alluded to the holding of the Supreme Court in
 
 Zicherman v. Korean Air Lines Co.,
 
 — U.S. -, -, 116 S.Ct. 629, 636, 133 L.Ed.2d 596 (1996). Reading the case while the parties were still before me, I learned for the first time that an essential premise of the holding of the Court of Appeals for the Second Circuit in
 
 Lockerbie
 
 I — the existence of a federal common law applicable to airplane crashes — may have been seriously undermined by
 
 Zicherman.
 
 When counsel for Mrs. Anderson asked what he should tell his client regarding the settlement, I told him that I needed time to consider the impact of
 
 Zicherman
 
 on a settlement that relied on
 
 Lockerbie I
 
 to justify according Mrs. Anderson approximately 85% of the recovery. If, as a first reading of
 
 Zicherman
 
 suggested, the distribution of the recovery would be governed by state law, there was a strong claim for North Carolina law, which provided a generous basis for calculating damages, while dividing the recovery equally between a spouse and an only child.
 

 On the day following the conference, counsel for Mrs. Anderson wrote a letter conceding that there was no longer an applicable federal common law. Instead, he agreed, consistent with
 
 Zicherman,
 
 that the applicable substantive law would be determined by the application of New York State’s choice of law rule. New York, he argued, would apply the law of Columbia, not North Carolina, to the issue in dispute here. At the same time, however, Mrs. Anderson’s counsel urged me not to decide which law applied so that the parties could pursue settlement discussions. On the next day he wrote to advise me that Mrs. Anderson was agreeable to decreasing her share of the recovery by $27,500, which would make possible the settlement to which Mrs. Housworth agreed and which I had indicated I would approve before reading
 
 Zicherman.
 
 This offer was conditioned upon its immediate acceptance. On Monday, the next business day, Mrs. Anderson’s counsel forwarded a two-month-old unpublished opinion by my colleague Judge Seybert, in which, notwithstanding
 
 Zicherman,
 
 she decided that federal common law governed the damages recoverable in an action brought under the Warsaw Convention.
 
 See Bissett v. Pan Am. World Airways,
 
 No. 89 CV 1460 (E.D.N.Y. May 21, 1996). Based on that holding, counsel argued that North Carolina law was not applicable.
 

 Under these circumstances, I would have preferred more time to come to an informed conclusion as to what law applies here before being asked to approve the $355,000 settlement, which was predicated on a legal premise that may no longer be valid. Indeed, when confronted with
 
 Zicherman,
 
 Judge Seybert was sufficiently moved to vacate a judgment and fully reconsider the issue before reaching the conclusion she did. Nevertheless, because Mrs. Anderson’s last settlement offer required an immediate ruling, I tentatively concluded that North Carolina law applied here. This edited and revised memorandum reflects my considered judgment that North Carolina law is applicable here.
 

 Turning first to
 
 Zicherman,
 
 the Supreme Court held that there were two choice of law issues to resolve in cases filed pursuant to the Warsaw Convention. Specifically, the Court held that Article 24 of the Convention “left to domestic law the question of who may recover and what compensatory damages are available to them.”
 
 Zicherman,
 
 — U.S. at -, 116 S.Ct. at 634. The first choice of law issue was “which sovereign’s domestic law.”
 
 Id.
 
 at-, 116 S.Ct. at 635. While this issue was to be decided by the law of
 
 *172
 
 the forum, the Supreme Court was spared the necessity of deciding it in
 
 Zicherman
 
 because the parties stipulated that United States law applied. The next question to be resolved was “which particular law of the United States provides the governing rule.’-’
 
 Id.
 
 at-, 116 S.Ct. at 636. In answering this question, the Supreme Court expressly rejected the federal common law approach taken by the Court of Appeals for the Second Circuit:
 

 [T]he Convention itself contains no rule of law governing the present question; nor does it empower us to develop some common law rule — under cover of general admiralty or otherwise — that will supersede the normal federal disposition. Congress may choose to enact special provisions applicable to Warsaw-Convention cases, as some countries have done.
 
 Absent such legislation, however, Articles 17 and 21(2) provide nothing more than a pass-through, authorizing us to apply the law that would govern in the absence of the Warsaw Convention.
 

 Id.
 
 (emphasis added) (citation omitted). In
 
 Zicherman,
 
 the law “that would govern in the absence of the Warsaw Convention” was the federal Death on the High Seas Act (“DOHSA”), 46 U.S.C.App. § 761 et seq., because the crash came within the literal terms of a statute that preempted state law.
 
 See also Alcabasa v. Korean Air Lines Co.,
 
 62 F.3d 404, 407 (D.C.Cir.1995).
 

 Moreover, the Supreme Court went on to expressly reject the holding of the Court of Appeals for the Second Circuit that “a uniform law should govern Warsaw Convention cases.”
 
 Zicherman v. Korean Air Lines Co.,
 
 43 F.3d 18, 21 (2d Cir.1994). The Supreme Court found this to be an area in which the imposition of uniformity was not feasible and reiterated its view that the “Convention neither adopted any uniform rule of its own nor authorized national courts to pursue uniformity
 
 in derogation of otherwise applicable law.” Zicherman,
 
 — U.S. at -, 116 S.Ct. at 636 (emphasis added). Nor was the Supreme Court impressed by the need to create uniformity “between over-land and over-sea accidents.”
 
 Id.
 
 Noting that even such limited uniformity would still leave “vast discrepancies among the various domestic laws untouched,”
 
 Id.,
 
 it concluded by rejecting petitioner’s claim “that the Convention contains an implicit authorization for national courts to create uniformity between overland and over-sea accidents.”
 
 Id.
 

 Applying
 
 Zicherman
 
 here, the first question that must be resolved is which country’s domestic law — the United States’ or Columbia’s — governs the issue “of who may recover and what compensatory damages are available.”
 
 Id.
 
 at - — , 116 S.Ct. at 634. The answer to this question should be deferred until it is determined
 
 which
 
 United States law would otherwise apply. This determination is critical because it is not possible to resolve a choice of law issue — here, between the law of the United States and that of Columbia — before we know what laws are in conflict. Indeed, until such a determination is made, we do not know if there is a conflict that requires resolution.
 

 Coming then to the question of which United States law should be applied, we ask what law “would govern in the absence of the Warsaw Convention.”
 
 Zicherman,
 
 —— U.S. at-, 116 S.Ct. at 636. Because this is a case that would otherwise be based on diversity of citizenship, 28 U.S.C. § 1332,
 
 [3]
 
 we look to the New York choice of law rules. Mrs. Anderson’s counsel agreed with this approach. The day after the conference at which the significance of
 
 Zicherman
 
 became apparent, counsel for Mrs. Anderson called to my attention
 
 Barkanic v. General Admin. of CAAC
 
 923 F.2d 957 (2d Cir.1991), which involved a wrongful death action brought by the estates of two United States citizens who did not reside in New York and who were killed in an airplane crash in China. While the basis of federal jurisdiction in
 
 Barkanic
 
 was the Foreign Sovereign Immunities Act (“FSIA”), Pub.L. 94-583, 90 Stat. 2891 (codified as amended in scattered sections of 28 U.S.C.), rather than the Warsaw Convention,
 
 *173
 
 the Court of Appeals applied the choice of law rule that would have applied if jurisdiction was based on diversity of citizenship. The conflict of laws in
 
 Barkanic
 
 was between a $20,000 limitation that Chinese law imposed on the amount of damages recoverable in a wrongful death action and the unlimited recovery available under the law of the state of the domicile of the decedent. Because the airplane crashed in China, the Court of Appeals held that New York would apply the law of China.
 

 Barkanic
 
 is of little comfort to Mrs. Anderson because the issue there involved New York choice of law rules that related specifically and exclusively “to
 
 all
 
 post-accident loss distribution rules, including rules that limit wrongful death eases.”
 
 Id.
 
 at 963. Specifically, the loss allocation choice of law rule applied in
 
 Barkanic
 
 was the second of the so called
 
 “Neumeier
 
 Rules,” named for the case in which Chief Judge Fuld formulated them.
 
 See id.
 
 at 962
 
 (citing Neumeier v. Kuehner,
 
 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972). This rule sets forth the manner in which New York resolves a conflict of laws case after it first determines that there are two jurisdictions that each have roughly equal interests in the application of their loss allocating rules, “which prohibit, assign, or limit liability after the tort occurs.”
 
 Padula v. Lilarn Properties Corp.,
 
 84 N.Y.2d 519, 620 N.Y.S.2d 310, 312, 644 N.E.2d 1001, 1003 (1994);
 
 see also Bankers Trust Co. v. Lee Keeling & Assocs.,
 
 20 F.3d 1092, 1096 (10th Cir.1994) (interpreting New York law). As Chief Judge Kaye recently explained:
 

 The second
 
 Neumeier
 
 rule addresses “true” conflicts, where the parties are domiciled in different States and the local law favors the respective domiciliary. When plaintiff’s State, for example, would allocate loss to defendant but defendant’s State would force plaintiff to bear the loss, a true conflict arises.
 

 Cooney v. Osgood Machinery, Inc.,
 
 81 N.Y.2d 66, 595 N.Y.S.2d 919, 923, 612 N.E.2d 277, 281 (1993);
 
 see also Bader v. Purdom,
 
 841 F.2d 38, 40 (2d Cir.1988);
 
 Bankers Trust Co.,
 
 20 F.3d at 1097. New York resolves such a conflict by deferring to the law of “the situs of the tort ... as a ‘tie breaker’ because that is the only state with which both parties have purposefully associated themselves in a significant way.”
 
 Cooney,
 
 595 N.Y.S.2d at 923, 612 N.E.2d at 281.
 

 The assumption underlying the second
 
 Neumeier
 
 rule, that the law of the situs of the tort should apply because it is the one “with which both parties have purposefully associated,”
 
 id.
 
 at 923, 612 N.E.2d at 281, is not present in airplane crashes in which the situs is “purely adventitious,”
 
 see Long v. Pan Am. World Airways,
 
 16 N.Y.2d 337, 266 N.Y.S.2d 513, 516, 213 N.E.2d 796, 798 (1965);
 
 Thomas v. United Air Lines,
 
 24 N.Y.2d 714, 301 N.Y.S.2d 973, 978, 249 N.E.2d 755, 758-59
 
 cert. denied,
 
 396 U.S. 991, 90 S.Ct. 484, 24 L.Ed.2d 453 (1969). Indeed, in
 
 Cousins v. Instrument Flyers, Inc.,
 
 44 N.Y.2d 698, 405 N.Y.S.2d 441, 442, 376 N.E.2d 914, 915 (1978), which was decided after
 
 Neumeier v. Kuehner,
 
 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), the New York Court of Appeals strongly suggested that the situs based
 
 Neumeier
 
 Rules would not apply to cases arising out of airplane crashes because “the place of the wrong, if it can even be ascertained, is most often fortuitous.”
 
 Barkanic,
 
 however, resolved that issue for wrongful death actions where the situs of the crash is the destination of the decedent’s flight and the jurisdiction in which the defendants are incorporated. Nevertheless, the second
 
 Neumeier
 
 rule, upon which the holding in
 
 Barkanic
 
 turned, does not control here. Nor does
 
 Barkanic.
 

 Unlike
 
 Barkanic,
 
 this ease does not involve a choice of loss limitation rules or a true conflict in which two “jurisdictions have an interest in the application of their law.”
 
 Estate of Crichton,
 
 20 N.Y.2d 124, 281 N.Y.S.2d 811, 820 n. 8, 228 N.E.2d 799, 806 n. 8 (1967). If the case went to trial, the first issue would be the elements of damages recoverable in a wrongful death action. North Carolina law provides for a generous recovery in this area and Mrs. Anderson’s counsel has not cited any law of Columbia that would provide less and possibly create a true conflict. More significantly, whether the case was tried or settled, the second question to be resolved is the allocation of the recovery among the beneficiaries. On this issue, coun
 
 *174
 
 sel has not cited any law of Columbia inconsistent with North Carolina law. Even if there was such a law, there would be no true conflict because it is generally recognized that, as to this issue, only a jurisdiction where the decedent or his dependents are domiciled has an interest in the application of its laws. As Professor Weintraub has aptly observed:
 

 One matter over which it is clear that the place of impact as such has no interest is in the manner of distributing the proceeds of a wrongful death recovery. Any conflict in regard to such distribution between the law of the place of impact and the law of the domicile of the decedent and his next of kin is spurious. The law of the domicile should control.
 

 Russell J. Weintraub,
 
 Commentary on the Conflict of Laws
 
 § 6.10, at 302 (3d ed. 1986). Consistent with this analysis, the New York Court of Appeals has explicitly held that the law of the marital domicile had the greatest interest in matters relating to the distribution of the estate of one of the parties to the marriage,
 
 see Estate of Clark,
 
 21 N.Y.2d 478, 288 N.Y.S.2d 993, 999, 236 N.E.2d 152, 156-57 (1968);
 
 Estate of Crichton,
 
 20 N.Y.2d 124, 281 N.Y.S.2d 811, 817, 228 N.E.2d 799, 803-04 (1967), and it has refused to apply the law of the situs to a wrongful death action in a case involving an issue similar to the one in this case.
 
 See Long v. Pan Am. World Airways,
 
 16 N.Y.2d 337, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965) (Fuld, C.J.);
 
 see also Restatement (Second) of Conflict of Laws
 
 § 177, comment b (adopted 1969) (“In a situation where one state is the state of domicil of the decedent and the beneficiaries ... it would seem that, ordinarily at least, the wrongful death statute of this state should be applied to determine how the recovery in a wrongful death action should be distributed.”).
 

 The New York case most directly on point is
 
 Estate of Caccamo,
 
 71 Misc.2d 391, 336 N.Y.S.2d 77 (Kings Cty.Sur.Ct.1972), a characteristically lucid opinion of Judge Sobel, one of the most distinguished judges to hold the position of Surrogate of Kings County.
 
 Caccamo
 
 was a wrongful death action in which the decedent, a resident of Nevada, was killed in Connecticut when the automobile in which he was a passenger collided with a truck registered in Connecticut. The judge who presided at the trial “charged Connecticut law on both the negligence aspects and the damage aspects,”
 
 id.
 
 336 N.Y.S.2d at 79, and the jury rendered a verdict in the sum of $125,000. The issue before Judge Sobel was how the $125,000 was to be distributed. The decedent, as noted, was a resident of Nevada, and was survived by four infant children who resided in Nevada and two adult married daughters from a prior marriage who resided in Connecticut. Judge Sobel observed that, notwithstanding the fact that the recovery was determined by Connecticut law, under the prevailing choice of law rules, he was obligated to isolate the particular issue and then analyze the relevant interests of the respective states (an analysis that is consistent with current New York law). “We follow that direction,” he wrote, “by isolating from the ‘recovery5 aspects the ‘distribution5 aspects.”
 
 Id.
 
 at 79. “[T]he choice of law made by this Court, also a forum court, on the ‘distribution5 aspects is not compelled or need not be influenced by the choice made by the trial court on the ‘recovery5 aspects.”
 
 Id.
 
 at 81.
 

 Turning to the choice of law rule, Judge Sobel observed that Nevada, “the state containing the people who will receive the damages recovered,” had the predominant, if not the only interest in the application of its laws to issue relating to the distribution of the recovery.
 
 Id.
 
 “It seems logical in this instance to conclude that Nevada is the state most vitally concerned with the manner in which the widow and infant children of a Nevada decedent will be compensated for their pecuniary loss resulting from the wrongful death of their breadwinner.”
 
 Id.
 

 Judge Sobel’s opinion, which was followed by Surrogate Laurino in
 
 Estate of Layden,
 
 92 Misc.2d 353, 400 N.Y.S.2d 282, 283 (Queens Cty.Sur.Ct.1977), is consistent with sound policy and New York choice of law rules and provides the rule of decision here. Here, as in
 
 Caccamo
 
 and
 
 Layden,
 
 the only state that has an interest in the application of its recovery distribution scheme is the state, where the decedent was domiciled and
 
 *175
 
 his spouse resided. No jurisdiction associated with this case has any interest in providing his widow with any greater share of the recovery than North Carolina. Indeed, the only jurisdiction other than North Carolina with an interest in the distribution would be Georgia, where Bradley Anderson resides. Georgia, however, has no interest in
 
 reducing
 
 the amount that one of its residents receives in a settlement. More significantly, like North Carolina, Georgia law provides that recoveries in wrongful death actions “shall be equally divided, share and share alike, between the surviving spouse and the children per capita.” Ga.Code Ann. § 51 — 4-2(d) (1996).
 

 The fact that North Carolina applies the lex loci delicti rule in tort cases,
 
 see Boudreau v. Baughman,
 
 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 (1988), is not dispositive here. “New York courts generally disfavor the renvoi doctrine and do not refer to the choice of law provisions of other jurisdictions.”
 
 Jean v. Francois,
 
 168 Misc.2d 48, 642 N.Y.S.2d 780, 781 (Sup.Ct.Roekland Cty. 1996);
 
 see also Nailen v. Ford Motor Co.,
 
 873 F.2d 94, 96 (5th Cir.1989). The rejection of the renvoi doctrine is consistent with the New York choice of law rules which, as a threshold matter, require a determination of which jurisdiction has an interest in having its laws applied by looking to the purpose of the underlying laws in conflict.
 
 See Cooney v. Osgood Machinery, Inc.,
 
 81 N.Y.2d 66, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277, 280 (1993);
 
 Istim, Inc. v. Chemical Bank,
 
 78 N.Y.2d 342, 575 N.Y.S.2d 796, 798, 581 N.E.2d 1042, 1044 (1991);
 
 Estate of Crichton,
 
 20 N.Y.2d 124, 281 N.Y.S.2d 811, 820 n. 8, 228 N.E.2d 799, 806 (1967). While North Carolina courts may prefer a situs based choice of law rule, which ignores the policy underlying its substantive law, the application of North Carolina’s choice of law rule “would frustrate the very goals of governmental-interest analysis.”
 
 Pfau v. Trent Aluminum Co.,
 
 55 N.J. 511, 526, 263 A2d 129, 137 (1972).
 

 More significantly, it cannot be assumed that North Carolina would refuse to apply its own law where the issue related not to the determination of damages, but to division of the recovery. Indeed, in
 
 In re Badgett,
 
 226 N.C. 92, 93, 36 S.E.2d 658, 659 (1946), the North Carolina Supreme Court applied its own statute of distribution to the proceeds of a settlement of a Federal Employers’ Liability Act (“FELA”), 45 U.S.C. § 51 et seq., cause of action notwithstanding that FELA, unlike the Warsaw Convention, provided that damages be awarded to specified beneficiaries based on the economic loss each suffered. The holding of the North Carolina Supreme Court applies with greater force here, where the Warsaw Convention does not provide a method for determining, awarding, or distributing damages. Under the circumstances, it seems clear that North Carolina would apply its own law to the distribution of any settlement or recovery.
 

 The foregoing discussion plainly shows that, if United States law applies here, North Carolina law applies to the issues under discussion. Accordingly, it is now appropriate to return to the first choice of law question identified in
 
 Zicherman,
 
 namely, whether United States or Columbian law applies. While this may be a matter that requires a federal choice of law rule,
 
 see Federal Deposit Ins. Corp. v. Lattimore Land Corp.,
 
 656 F.2d 139, 148 n. 16 (5th Cir.1981), the Supreme Court has long since rejected the application of the lex loci delicti rule in favor of a choice of law rule that, like New York’s rule, is based on rational considerations of policy.
 
 See Romero v. International Terminal Operating Co.,
 
 358 U.S. 354, 384, 79 S.Ct. 468, 486-87, 3 L.Ed.2d 368 (1959) (“The amount and type of recovery which a foreign seaman may receive from his foreign employer while sailing on a foreign ship should not depend on the wholly fortuitous circumstance of the place of the injury.”);
 
 Lauritzen v. Larsen,
 
 345 U.S. 571, 583, 73 S.Ct. 921, 928-29, 97 L.Ed. 1254 (1953) (same);
 
 see also Bickel v. Korean Air Lines Co.,
 
 83 F.3d 127, 130-31 (6th Cir.1996);
 
 Scott v. Eastern Air Lines,
 
 399 F.2d 14, 28-29 (3d Cir.1967),
 
 cert. denied,
 
 393 U.S. 979, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968). Under such an approach it is clear that United States/North Carolina law governs.
 

 Here, the relevant policy considerations relate to the division of a wrongful-
 
 *176
 
 death recovery between the decedent’s wife and his child. In
 
 United States v. Yazell,
 
 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), the Supreme Court recognized the compelling interest that states have in applying their law to this issue:
 

 Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements. They should be overridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied.
 

 Id.
 
 at 353, 86 S.Ct. at 507. Similar deference has been applied to temper the preemptive effect of federal maritime law on state wrongful death statutes.
 
 See Yamaha Motor Corp. v. Calhoun,
 
 — U.S.-,- n. 8, 116 S.Ct. 619, 626 n. 8, 133 L.Ed.2d 578 (1996) (“The federal cast of admiralty law, we have observed, means that ‘state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system[,] [b]ut this limitation still leaves the States a wide scope.’
 
 Romero v. International Terminal Operating Co.,
 
 358 U.S. 354, 373, 79 S.Ct. 468, 480, 3 L.Ed.2d 368 (1959)”).
 

 While both
 
 Yazell
 
 and
 
 Yamaha
 
 involved a conflict between federal law and state law rather than a conflict between state law and foreign law, the policy considerations that the Supreme Court articulated in those eases are applicable in this choice of law context.
 
 See Estate of Crichton,
 
 281 N.Y.S.2d at 817, 228 N.E.2d at 803-04. Mrs. Anderson has not identified either a law of Columbia that is in conflict with that of North Carolina, nor, if there is such a law, has she articulated a “clear and substantial” interest Columbia would have with respect to the distribution of the damages recovered. Not only is there lacking an overriding interest in Columbian law, there simply is no interest. Accordingly, the answer to the first
 
 Zicherman
 
 eonflicts question is that the domestic law of the United States applies here.
 
 [4]
 

 The unpublished opinion of my colleague Judge Seybert in
 
 Bissett v. Pan Am. World Airways,
 
 No. 89 CV 1460 (E.D.N.Y. May 21, 1996), which Mrs. Anderson’s counsel also called to my attention, does not provide a basis for ignoring North Carolina law here. There, Judge Seybert concluded that the Supreme Court in
 
 Zicherman
 
 intended only to reject a federal common law rule that would preempt DOHSA and apply the same rule to accidents over water as would apply to accidents over land. Judge Seybert concluded, however, that the holding of
 
 Lockerbie I
 
 that federal common law, rather than state law, was otherwise applicable survived the holding in
 
 Zicherman.
 
 Without indicating which state law was preempted, she, therefore, upheld a jury’s award that included damages for loss of society because such damages were permitted under federal maritime law.
 

 In my view, Judge Seybert reads
 
 Zicherman
 
 too narrowly and
 
 Lockerbie I
 
 too broadly.
 
 Zicherman
 
 flatly rejected the premise underlying the Second Circuit’s holding that the Warsaw Convention preempts state law. Specifically, in
 
 Lockerbie I,
 
 the Court of Appeals had held that state law was preempted because the subject matter of the Warsaw Convention “demands uniformity vital to national interests such that allowing state regulation “would create potential frustration of national purposes.’”
 
 Lockerbie I,
 
 928 F.2d at 1275
 
 (citing San Diego Bldg. Trades Council v. Garmon,
 
 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)). Justice Scalia made it plain in
 
 Zicherman
 
 that the goal of achieving uniformity in Warsaw Convention cases was simply not feasible and that the need to attain it did not require the creation of “a rule of damages that will be applicable in all suits brought under the Convention.”
 
 Zicherman,
 
 — U.S. at-, 116 S.Ct. at 636. Uniformity, therefore, cannot
 
 *177
 
 provide the justification for displacing state law.
 

 Nor is it accurate to suggest that applying state law would significantly add to the lack of uniformity that already exists.
 
 See Zicherman,
 
 — U.S. at-, 116 S.Ct. at 636.
 
 [5]
 
 While we do have fifty states, we do not have fifty different rules on this or any other issue. “In the United States, every State today has enacted a wrongful-death statute,” and it has become part of our common law.
 
 Moragne v. States Marine Lines, Inc.,
 
 398 U.S. 375, 390-91, 90 S.Ct. 1772, 1782-83, 26 L.Ed.2d 339 (1970). Because the same British statute, known as Lord Campbell’s Act, was “the prototype of American wrongful-death statutes, most state statutes contained nearly identical language and have been similarly interpreted by state courts.”
 
 Sea-Land Services, Inc. v. Gaudet,
 
 414 U.S. 573, 581, 94 S.Ct. 806, 813, 39 L.Ed.2d 9 (1974). The differences that exist are more often than not represented by a majority and a minority rule. Moreover, because the issue of how damages are
 
 distributed
 
 is not one for which any compelling argument in favor of uniformity under the Warsaw Convention can be made, there is no need to adopt a uniform rule “in derogation of otherwise applicable law.”
 
 Zicherman,
 
 — U.S. at-, 116 S.Ct. at 636.
 

 This is not to suggest that
 
 Zicherman
 
 entirely overruled
 
 Lockerbie I
 
 or the Court of Appeals’ subsequent opinion in
 
 In re Air Disaster at Lockerbie, Scotland,
 
 37 F.3d 804 (2d Cir.1994)
 
 (“Lockerbie II
 
 ”),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). These cases interpret the Warsaw Convention as 1) precluding an award of punitive damages,
 
 Lockerbie I,
 
 928 F.2d at 1287, and 2) permitting a wide variety of compensatory damages,
 
 Lockerbie II,
 
 37 F.3d at 828. With regard to the choice of law question,
 
 Lockerbie I
 
 left open the possibility that state law would apply to actions under the Warsaw Convention, because “the language of the Convention itself preserves them,”
 
 Lockerbie I,
 
 928 F.2d at 1282, and in
 
 Lockerbie II,
 
 none of the parties disputed that federal maritime law applied,
 
 see Lockerbie II,
 
 37 F.3d at 828.
 

 The narrow holdings of
 
 Lockerbie I & II
 
 are fully consistent with Justice Scalia’s conclusion in
 
 Zicherman
 
 that “the damages recoverable — so long as they consist of compensation for harm incurred
 
 (“dommage survenu
 
 ”) — are to be determined by domestic law.”
 
 Zicherman,
 
 — U.S. at-, 116 S.Ct. at 635. To the extent, however, that
 
 Lockerbie II
 
 foreclosed the possibility, left open in
 
 Lockerbie I,
 
 that the applicable United States domestic law was state law,
 
 Zicherman
 
 appears to have overruled it.
 
 Cf. Yamaha Motor Corp. v. Calhoun,
 
 — U.S. -,---, 116 S.Ct. 619, 621-22, 133 L.Ed.2d 578 (1996) (federal maritime law does not preempt state remedies for wrongful death where “no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade”).
 

 Accordingly, for the foregoing reasons, I would not approve a settlement that did not reflect in a more appreciable way the likelihood that Bradley Anderson could obtain as much as 50% of the recovery. I do not suggest that Bradley should not settle the ease for significantly less than 50%. As this case has demonstrated, the risks of delay and of litigation warrant significant concessions to achieve a result that is fair to all parties.
 

 SO ORDERED.
 

 [1]
 

 . While settlement discussion are normally confidential, the substance of the discussions is reflected completely in formal applications and letters that are part of the record.
 

 [2]
 

 . Indeed, it was for this reason that I permitted Mrs. Housworth to intervene as guardian ad litem for Bradley Anderson.
 
 See
 
 Order filed May 15, 1995.
 

 [3]
 

 . "Most cases [under the Warsaw Convention] will fall under 28 U.S.C. § 1332 ...; only when plaintiffs and defendants are all aliens, but the United States is a nation with treaty jurisdiction, will it be necessary to invoke 28 U.S.C. § 1331.”
 
 Benjamins v. British European Airways,
 
 572 F.2d 913, 919 (2d Cir.1978),
 
 cert. denied,
 
 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979).
 

 [4]
 

 . In
 
 Bickel v. Korean Air Lines,
 
 83 F.3d 127, 130-31 (6th Cir.1996), the Court of Appeals for the Sixth Circuit applied the
 
 Restatement (Second) of Conflict of Laws
 
 § 175 (adopted 1969) to determine which sovereign's domestic law governed damages in a Warsaw Convention case. The
 
 Restatement,
 
 as previously noted, would require the application of United States/North Carolina law here.
 
 See Restatement
 
 § 177 cmt. b.
 

 [5]
 

 . Compounding the differences among the laws of different nations are the differences among the laws of each nation's political subdivisions. For example, as Justice Scalia noted, “Canada has adopted legislation setting forth who may bring suit under Article 24(2) [of the Warsaw Convention], but has left the question of what types of damages are recoverable to provincial law.”
 
 Zicherman,
 
 - U.S. at-, 116 S.Ct. at 635.